## BRADLEY ET AL. *v.* SCHOOL BOARD OF THE CITY OF RICHMOND ET AL.

No. 72–1322. Argued December 5, 1973—Decided May 15, 1974

BLACKMUN, J., delivered the opinion of the Court, in which all Members joined except MARSHALL and POWELL, JJ., who took no part in the consideration or decision of the case.

*William T. Coleman, Jr.,* argued the cause for petitioners. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Norman J. Chachkin, Charles Stephen Ralston, Eric Schnapper,* and *Louis R. Lucas.*

*George B. Little* argued the cause for respondents. With him on the brief were *James K. Cluverius* and *Conard B. Mattox, Jr.** 

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In this protracted school desegregation litigation, the District Court awarded the plaintiff-petitioners expenses and attorneys' fees for services rendered from March 10, 1970, to January 29, 1971. 53 F. R. D. 28 (ED Va. 1971). The United States Court of Appeals for the Fourth Circuit, one judge dissenting, reversed. 472 F. 2d 318 (1972). We granted certiorari, 412 U. S. 937 (1973), to determine whether the allowance of attorneys' fees

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Bork, Assistant Attorney General Pottinger, Deputy Solicitor General Wallace,* and *Gerald P. Norton* for the United States, and by *David S. Tatel* and *Armand Derfner* for the Lawyers' Committee for Civil Rights Under Law.

was proper. Pertinent to the resolution of the issue is the enactment in 1972 of § 718 of Title VII, the Emergency School Aid Act, 20 U. S. C. § 1617 (1970 ed., Supp. II), as part of the Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 235, 369.

## I

The suit was instituted in 1961 by 11 Negro parents and guardians against the School Board of the city of Richmond, Virginia, as a class action under the Civil Rights Act of 1871, 42 U. S. C. § 1983, to desegregate the public schools. On March 16, 1964, after extended consideration,[1] the District Court approved a "freedom of choice" plan by which every pupil was permitted to attend the school of the pupil's or the parents' choice, limited only by a time requirement for the transfer application and by lack of capacity at the school to which transfer was sought. On appeal, the Fourth Circuit, sit-

---

[1] See 317 F. 2d 429 (CA4 1963). Before trial, one pupil-plaintiff was admitted to the school of his choice, and the court ordered admission of the remaining 10. The District Court found that, in general, during the 1961–1962 school year, pupil assignments in Richmond were being made on the basis of dual attendance zones; that promotions were controlled by a "feeder" system whereby pupils initially assigned to Negro schools were promoted routinely only to Negro schools; and that, in the handling of some transfer requests from Negro pupils, the students were required to meet criteria to which white students of the same scholastic aptitude were not subject. The court declined, however, to grant general injunctive relief and ordered only the admission of the 10 pupils.

The Court of Appeals reversed in part. It held that not only were the individual minor plaintiffs entitled to relief, but that they were entitled to an injunction, on behalf of others of the class they represented and who were similarly situated, against the continuation of the discriminatory system and practices that were found to exist. *Id.,* at 438.

ting en banc, affirmed, with two judges dissenting in part, and held that the plan satisfied the Board's constitutional obligations. 345 F. 2d 310 (1965). The court saw no error in the trial court's refusal to allow the plaintiffs' attorneys more than a nominal fee ($75). *Id.*, at 321. The dissenters referred to the fee as "egregiously inadequate." *Id.*, at 324. On petition for a writ of certiorari, this Court, *per curiam*, 382 U. S. 103 (1965), summarily held that the petitioners improperly had been denied a full evidentiary hearing on their claim that a racially based faculty allocation system rendered the plan constitutionally inadequate under *Brown* v. *Board of Education*, 347 U. S. 483 (1954). In vacating the judgment of the Court of Appeals and in remanding the case, we expressly declined to pass on the merits of the desegregation plan and noted that further judicial review following the hearing was not precluded. 382 U. S., at 105.

After the required hearing, the District Court, on March 30, 1966, approved a revised "freedom of choice" plan [2] submitted by the Board and agreed to by the peti-

---

[2] Under the approved plan, the Board undertook steps "to eliminate a dual school system in the assignment of pupils" and to assure that opportunities were provided "for white children and Negro children to associate on equal terms in the public schools." App. 21a–22a. Generally, the plan permitted any child to attend any school in the city at his proper grade. The specific steps to be taken included (a) action to correct inequality in enrollment in relationship to capacity where schools in close proximity to each other had significant enrollment differences, (b) efforts to acquaint pupils in all schools with opportunities in other schools, and (c) the planning and creation of citywide centers, including workshops, institutes, and seminars, serving pupils from all areas of the city. *Id.*, at 22a–23a. In addition, the Board undertook to insure that the "pattern of assignment of teachers and other professional staff among the various schools of the system will not be such that schools are identifiable as intended for students of a particular race, color

tioners. App. 17a. It provided that if the steps taken by the Board "do not produce significant results during the 1966–67 school year, it is recognized that the freedom of choice plan will have to be modified." *Id.,* at 23a. This plan was in operation about four years. While it was in effect, *Green* v. *County School Board of New Kent County,* 391 U. S. 430 (1968), was decided. The Court there held that where methods promising speedier and more effective conversion to a unitary system were reasonably available, a freedom-of-choice plan was not acceptable. *Id.,* at 439–441.

Thereafter, on March 10, 1970, petitioners filed with the District Court a motion for further relief in the light of the opinions of this Court in *Green, supra,* in *Alexander* v. *Holmes County Board of Education,* 396 U. S. 19 (1969), and in *Carter* v. *West Feliciana Parish School Board,* 396 U. S. 290 (1970). Specifically, petitioners asked that the court "require the defendant school board forthwith to put into effect" a plan that would "promptly and realistically convert the public schools of the City of Richmond into a unitary non-racial system," and that the court "award a reasonable fee to [petitioners'] counsel." App. 25a. The court then ordered the Board to advise the court whether the public schools were being operated "in accordance with the constitutional requirements . . . enunciated by the United States Supreme Court." *Id.,* at 27a. The Board, by a statement promptly filed with the District Court, averred that it had operated the school system to the best of its knowledge and belief in accordance with the decree

or national origin, or such that teachers or other professional staff of a particular race are concentrated in those schools where all, or the majority, of the students are of that race." *Id.,* at 20a. Finally, the Board undertook to insure that the program for construction of new schools or additions to existing schools would "not be designed to perpetuate, maintain, or support racial segregation." *Id.,* at 23a.

of March 30, 1966, but that it has "been advised" that the city schools were "not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court." *Id.,* at 28a. It was also asserted that the Board had requested the Department of Health, Education, and Welfare to make a study and recommendation; that the Department had agreed to undertake to do this by May 1; and that the Board would submit a plan for the operation of the public school system not later than May 11. *Ibid.* Following a hearing, however, the District Court, on April 1, 1970, entered a formal order vacating its order of March 30, 1966, and enjoining the defendants "to disestablish the existing dual system" and to replace it "with a unitary system." See 317 F. Supp. 555, 558 (ED Va. 1970). Thereafter, the Board and several intervenors filed desegregation plans.

The initial plan offered by the Board and HEW was held unacceptable by the District Court on June 26, 1970. *Id.,* at 572. The court was concerned (a) with the fact that the Board had taken no voluntary action to change its freedom-of-choice plan after this Court's decision in *Green* two years before, *id.,* at 560, (b) with the plan's failure to consider patterns of residential segregation in fixing school zone lines or to use transportation as a desegregation tool, despite the decision in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 431 F. 2d 138 (CA4 1970), aff'd as modified, 402 U. S. 1 (1971), and (c) with its failure to consider racial factors in zoning, despite the approval thereof in *Warner* v. *County School Board of Arlington County,* 357 F. 2d 452 (CA4 1966). 317 F. Supp., at 577–578. The District Court also rejected desegregation plans offered by intervenors and by the petitioners.[3]

---

[3] The court rejected the petitioners' plan for utilizing contiguous zoning and pairing, satellite zoning, and noncontiguous pairing,

A second plan submitted by the Board was also deemed to be unsatisfactory in certain respects. Nonetheless, on August 17 the court found its adoption on an interim basis for 1970–1971 to be necessary, since the school year was to begin in two weeks.[4]  *Id.,* at 578. The court directed the defendants to file within 90 days a report setting out the steps taken "to create a unitary system . . . and . . . the earliest practical and reasonable date that any such system could be put into effect." *Ibid.*

The Board then submitted three other desegregation plans. Hearings were held on these and on still another plan submitted by the petitioners.[5]  On April 5, 1971,

---

together with the use of school and public transportation, because it felt that the lack of immediately available transportation facilities would preclude the plan's operation for the opening of the 1970–1971 school year. It noted that it otherwise found the plan to be reasonable and, if adopted, that it would result in a unitary system. 317 F. Supp. 555, 572 and 576 (ED Va. 1970). The court suggested that Richmond could not be desegregated without employment of techniques suggested by the petitioners and observed, "It would seem to the Court highly reasonable to require that the defendant school board take reasonably immediate steps toward this end." *Id.,* at 575.

[4] The interim plan included contiguous and satellite zoning, pairing, and some public transportation, principally of those pupils who were indigent. The problems that continued to concern the court were, most importantly, the fact that under the plan a large number of the district's elementary students would continue to attend schools that would be 90% or more Negro, while at the same time four elementary schools would remain all white; in addition, two high schools and certain secondary schools would continue to be racially identifiable. *Id.,* at 572–576.

[5] Under Plan I only proximal geographic zoning was to be used in making pupil assignments. This meant simply that a pupil would be assigned to the school nearest his home without regard to the resulting racial composition of that school. Although recognizing the desirability of neighborhood schools, the court rejected this plan

the court adopted the Board's third plan, which involved pupil reassignments and extensive transportation within the city. 325 F. Supp. 828 (ED Va. 1971).[6]

Meanwhile, the Board had moved for leave to make the school boards and governing bodies of adjoining Chester-

in view of the existence of Richmond housing patterns previously determined to have been fostered by governmental action. At the elementary and middle levels, this would have resulted in over half the students being assigned to schools that were racially identifiable; at the high school level almost 39% of the district's white pupils would have been isolated in one 97% white school. 325 F. Supp. 828, 833 (ED Va. 1971).

Plan II, which the Board most actively supported, was held unacceptable in that it embraced a continuation of the 1970–1971 interim plan and did little to integrate the elementary schools. The plan involved the use of zoning, as did Plan I, and contiguous pairing whereby schools in adjoining zones would have been consolidated. *Id.*, at 834.

Plan III, which the court ordered into effect, called for extensive busing of students, proximal geographic zoning, clusters, satellites, and faculty racial balance. In addition, the elementary, middle and high schools were to have a minority-majority student ratio under which each group's projected enrollment in a particular school was to be at least half of the group's projected citywide ratio. *Id.*, at 834–844.

The court also rejected the petitioners' plan, finding that Plan III resulted in "a narrower spread" of minority-majority student ratios in the various schools. *Id.*, at 844–846.

[6] Meanwhile, the District Court (a) on January 8, 1971, denied a motion made by some of the defendants that the judge disqualify himself because of personal bias, 324 F. Supp. 439 (ED Va. 1971); (b) on January 29 denied the petitioners' motion to order implementation of their proposed plan and also the Board's motion to modify the existing injunction restraining it from undertaking any new construction planning, 324 F. Supp. 456 (ED Va. 1971); and (c) on February 10 denied a motion for summary judgment as to certain defendants with respect to costs, fees, and damages, 324 F. Supp. 401 (ED Va. 1971). See also 315 F. Supp. 325 (ED Va 1970); 51 F. R. D. 139 (ED Va. 1970).

field and Henrico Counties, as well as the Virginia State Board of Education, parties to the litigation, and to serve upon these entities a third-party complaint to compel them to take all necessary action to bring about the consolidation of the systems and the merger of the boards. The court denied the defense motion for the convening of a three-judge court. 324 F. Supp. 396 (ED Va. 1971).

On January 10, 1972, the court ordered into effect a plan for the integration of the Richmond schools with those of Henrico and Chesterfield Counties. 338 F. Supp. 67 (ED Va. 1972). On appeal, the Fourth Circuit, sitting en banc, reversed, with one judge dissenting, holding that state-imposed segregation had been "completely removed" in the Richmond school district and that the consolidation was not justified in the absence of a showing of some constitutional violation in the establishment and maintenance of these adjoining and separate school districts. 462 F. 2d 1058, 1069 (1972). We granted cross-petitions for writs of certiorari. 409 U. S. 1124 (1973). After argument, the Court of Appeals' judgment was affirmed by an equally divided Court. *Richmond School Board* v. *Board of Education,* 412 U. S. 92 (1973).

## II

The petitioners' request for a significant award of attorneys' fees was included, as has been noted, in their pivotal motion of March 10, 1970. App. 25a. That application was renewed on July 2. *Id.,* at 66a. The District Court first suggested, by letter to the parties, that they attempt to reach agreement as to fees. When agreement was not reached, the court called for supporting material and briefs.[7] In due course the court awarded counsel fees in the amount of $43,355 for services ren-

---

[7] Petitioners initially suggested $46,820 in fees and $13,327.56 in expenses, a total of $60,147.56. App. 94a–95a.

dered from March 10, 1970, to January 29, 1971, and expenses of $13,064.65. 53 F. R. D. 28, 43–44 (ED Va. 1971).

Noting the absence at that time of any explicit statutory authorization for an award of fees in school desegregation actions, *id.*, at 34, the court based the award on two alternative grounds rooted in its general equity power.[8] First, the court observed that prior desegregation decisions demonstrated the propriety of awarding counsel fees when the evidence revealed obstinate noncompliance with the law or the use of the judicial process for purposes of harassment or delay in affording rights clearly owed.[9] Applying the test enunciated by the Fourth Cir-

---

[8] The court discussed, 53 F. R. D. 28, 34–36 (ED Va. 1971), but did not rely on the "common fund" theory under which an individual litigant's success confers a substartial benefit on an ascertainable class and the exercise of the court's equitable discretion to allow a fee results in spreading the cost the litigant has incurred among those who have benefited by his efforts. See *Trustees* v. *Greenough,* 105 U. S. 527 (1882); *Sprague* v. *Ticonic National Bank,* 307 U. S. 161 (1939).

The court felt, however, that there were other grounds on which an award of counsel fees could be based. It referred to *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375 (1970), where this Court, recognizing the rule that attorneys' fees are not ordinarily recoverable as costs, nonetheless noted that exceptions to this rule existed "for situations in which overriding considerations indicate the need for such a recovery." *Id.,* at 391–392. There the Court approved an award of fees to successful shareholder plaintiffs in a suit to set aside a corporate merger accomplished through the use of a misleading proxy statement, in violation of § 14 (a) of the Securities Exchange Act of 1934, 15 U. S. C. § 78n (a). It was said: "The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale." 396 U. S., at 392. See also *Hall* v. *Cole,* 412 U. S. 1 (1973).

[9] See *Brewer* v. *School Board of the City of Norfolk,* 456 F. 2d 943, 951–952 (CA4), cert. denied, 406 U. S. 933 (1972); *Nesbit* v. *Statesville City Board of Education,* 418 F. 2d 1040, 1043

cuit in 345 F. 2d, at 321, the court sought to determine whether "the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinacy." Examining the history of the litigation, the court found that at least since 1968 the Board clearly had been in default in its constitutional duty as enunciated in *Green*. While reluctant to characterize the litigation engendered by that default as unnecessary in view of the ongoing development of relevant legal standards, the court observed that the actions taken and the defenses asserted by the Board had caused an unreasonable delay in the desegregation of the schools and, as a result, had caused the plaintiffs to incur substantial expenditures of time and money to secure their constitutional rights.[10]

(CA4 1969); *Williams* v. *Kimbrough*, 415 F. 2d 874, 875 (CA5 1969), cert. denied, 396 U. S. 1061 (1970); *Rolfe* v. *County Board of Education of Lincoln County*, 391 F. 2d 77, 81 (CA6 1968); *Clark* v. *Board of Education of Little Rock School District*, 369 F. 2d 661, 670–671 (CA8 1966); *Griffin* v. *County School Board of Prince Edward County*, 363 F. 2d 206 (CA4), cert. denied, 385 U. S. 960 (1966); *Bell* v. *School Board of Powhatan County*, 321 F. 2d 494, 500 (CA4 1963).

[10] The District Court stated:

"At each stage of the proceedings the School Board's position has been that, given the choice between desegregating the schools and committing a contempt of court, they would choose the first, but that in any event desegregation would only come about by court order.

"It is no argument to the contrary that political realities may compel school administrators to insist on integration by judicial decree and that this is the ordinary, usual means of achieving compliance with constitutional desegregation standards. If such considerations lead parties to mount defenses without hope of success, the judicial process is nonetheless imposed upon and the plaintiffs are callously put to unreasonable and unnecessary expense." 53 F. R. D., at 39.

As an alternative basis for the award, the District Court observed that the circumstances that persuaded Congress to authorize by statute the payment of counsel fees under certain sections of the Civil Rights Act of 1964 [11] were present in even greater degree in school desegregation litigation. In 1970–1971, cases of this kind were characterized by complex issues pressed on behalf of large classes and thus involved substantial expenditures of lawyers' time with little likelihood of compensation or award of monetary damages. If forced to bear the burden of attorneys' fees, few aggrieved persons would be in a position to secure their and the public's interests in a nondiscriminatory public school system. Reasoning from this Court's *per curiam* decision in *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 (1968), the District Judge held that plaintiffs in actions of this kind were acting as private attorneys general in leading school boards into compliance with the law, thereby effectuating the constitutional guarantee of nondiscrimination and rendering appropriate the award of counsel fees. 53 F. R. D., at 41–42.

The Court of Appeals, in reversing, emphasized that the Board was not operating "in an area where the practical methods to be used were plainly illuminated or where prior decisions had not left a 'lingering doubt' as to the proper procedure to be followed," particularly in the light of uncertainties existing prior to this Court's then impending decision in *Swann* v. *Charlotte-Mecklenburg*

[11] Title 42 U. S. C. § 2000a–3 (b) authorizes an allowance of a reasonable attorney's fee to a prevailing party, other than the United States, in an action under the public accommodation subchapter of the Civil Rights Act of 1964. Similarly, 42 U. S. C. § 2000e–5 (k) authorizes an allowance of a reasonable attorney's fee to a prevailing party, other than the Equal Employment Opportunity Commission or the United States, in an action under the equal employment opportunity subchapter of that Act.

*Board of Education,* 402 U. S. 1 (1971). 472 F. 2d, at 327. It felt that by the failure of Congress to provide specifically for counsel fees "in a statutory scheme designed to further a public purpose, it may be fairly accepted that it did so purposefully," and that "if such awards are to be made to promote the public policy expressed in legislative action, they should be authorized by Congress and not by the courts." *Id.,* at 330–331.

After initial submission of the case to the Court of Appeals, but prior to its decision, the Education Amendments of 1972, of which § 718 of Title VII of the Emergency School Aid Act is a part, became law. Section 718, 20 U. S. C. § 1617 (1970 ed., Supp. II), grants authority to a federal court to award a reasonable attorney's fee when appropriate in a school desegregation case.[12] The Court of Appeals, sitting en banc, then heard argument as to the applicability of § 718 to this and other litigation.[13] In the other cases it held that only legal services rendered after July 1, 1972, the effective date of § 718, see Pub. L. 92–318, § 2 (c)(1), 86 Stat. 236, were compensable under that statute. *Thompson* v. *School Board*

[12] "§ 1617. Attorney fees.

"Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

[13] The fee issue had been argued in the Court of Appeals on March 7, 1972. The Education Amendments of 1972 were approved by the President on June 23. The argument before the en banc court took place on October 2.

*of the City of Newport News,* 472 F. 2d 177 (CA4 1972). In the instant case the court held that, because there were no orders pending or appealable on either May 26, 1971, when the District Court made its fee award, or on July 1, 1972, when the statute became effective, § 718 did not sustain the allowance of counsel fees.

## III

In *Northcross v. Board of Education of the Memphis City Schools,* 412 U. S. 427, 428 (1973), we held that under § 718 "the successful plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' " We decide today a question left open in *Northcross,* namely, "whether § 718 authorizes an award of attorneys' fees insofar as those expenses were incurred prior to the date that that section came into effect." *Id.,* at 429 n. 2.

The District Court in this case awarded counsel fees for services rendered from March 10, 1970, when petitioners filed their motion for further relief, to January 29, 1971, when the court declined to implement the plan proposed by the petitioners. It made its award on May 26, 1971, after it had ordered into effect the non-interim desegregation plan which it had approved. The Board appealed from that award, and its appeal was pending when Congress enacted § 718. The question, properly viewed, then, is not simply one relating to the propriety of retroactive application of §.718 to services rendered prior to its enactment, but rather, one relating to the applicability of that section to a situation where the propriety of a fee award was pending resolution on appeal when the statute became law.

This Court in the past has recognized a distinction between the application of a change in the law that takes place while a case is on direct review, on the one hand,

and its effect on a final. judgment [14] under collateral attack,[15] on the other hand. *Linkletter* v. *Walker*, 381 U. S. 618, 627 (1965). We are concerned here only with direct review.

A

We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

The origin and the justification for this rule are found in the words of Mr. Chief Justice Marshall in *United States* v. *Schooner Peggy*, 1 Cranch 103 (1801):

"It is in the general true that the province of an appellate court is only to enquire whether a judg-

---

[14] By final judgment we mean one where "the availability of appeal" has been exhausted or has lapsed, and the time to petition for certiorari has passed. *Linkletter* v. *Walker*, 381 U. S. 618, 622 n. 5 (1965).

[15] In *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371, 374 (1940), the Court noted that the effect of a subsequent ruling of invalidity on a prior final judgment under collateral attack is subject to no fixed "principle of absolute retroactive invalidity" but depends upon consideration of "particular relations . . . and particular conduct." Questions "of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination." *Ibid.* And in *Linkletter* it was observed: "Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U. S., at 629.

See Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L. J. 907 (1962); Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201 (1965).

ment when rendered was erroneous or not. But if
subsequent to the judgment and before the decision
of the appellate court, a law intervenes and positively
changes the rule which governs, the law must be
obeyed, or its obligation denied. If the law be con-
stitutional . . . I know of no court which can
contest its obligation. It is true that in mere private
cases between individuals, a court will and ought to
struggle hard against a construction which will, by
a retrospective operation, affect the rights of parties,
but in great national concerns . . . the court must
decide according to existing laws, and if it be neces-
sary to set aside a judgment, rightful when rendered,
but which cannot be affirmed but in violation of
law, the judgment must be set aside." *Id.*, at 110.[16]

In the wake of *Schooner Peggy*, however, it remained
unclear whether a change in the law occurring while a
case was pending on appeal was to be given effect only
where, by its terms, the law was to apply to pending
cases, as was true of the convention under consideration
in *Schooner Peggy*, or, conversely, whether such a change

---

[16] *Schooner Peggy* concerned a condemnation following the seizure
of a French vessel by an American ship. The trial court found that
the vessel was within French territorial waters at the time of seizure
and, hence, was not a lawful prize. On appeal, the Circuit Court
reversed, holding that the vessel in fact was on the high seas. A
decree was entered accordingly. While the case was pending on
appeal to this Court, a convention with France was entered into
providing in part: "Property captured, and not yet *definitively*
condemned, or which may be captured before the exchange of ratifi-
cations . . . shall be mutually restored." 1 Cranch, at 107. This
Court reversed, holding that it must apply the terms of the conven-
tion despite the propriety of the Circuit Court's decision when it was
rendered, and that the vessel was to be restored since, by virtue of
the pending appeal, it had not been *"definitively* condemned," *id.*,
at 108.

in the law must be given effect *unless* there was clear indication that it was *not* to apply in pending cases. For a very long time the Court's decisions did little to clarify this issue.[17]

---

[17] In *United States* v. *Chambers*, 291 U. S. 217 (1934), the Court held that pending prosecutions, including those on appeal, brought pursuant to the National Prohibition Act were to be dismissed in view of the interim ratification of the Twenty-first Amendment, absent inclusion of a saving clause. In *Carpenter* v. *Wabash R. Co.*, 309 U. S. 23 (1940), the Court, in reliance on *Schooner Peggy*, held that an amendment to the Bankruptcy Act, effected while the case was pending on petition for writ of certiorari, was to be given effect. The amendment, however, provided explicitly that it was applicable to railroad receiverships then pending in any United States court. In *Vandenbark* v. *Owens-Illinois Glass Co.*, 311 U. S. 538 (1941), again in reliance on *Schooner Peggy*, it was held that a federal appellate court, in diversity jurisdiction, must follow a state supreme court decision changing the applicable state law subsequent to the decision in the federal trial court. In *Ziffrin, Inc.* v. *United States*, 318 U. S. 73 (1943), the Court held that an amendment to the Interstate Commerce Act, made after the hearing upon an application for a permit to continue contract carrier operations, was to be given effect. "A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law." *Id.*, at 78. In *United States* v. *Alabama*, 362 U. S. 602 (1960), the District Court had dismissed an action under the Civil Rights Act of 1957, 42 U. S. C. § 1971 (c), brought by the United States against the State of Alabama and others, and did so with respect to Alabama on the ground that the Act did not authorize the action against the State. While the case was pending after a grant of certiorari, the Civil Rights Act of 1960, 74 Stat. 86, was passed, expressly authorizing an action of that kind against a State. The Court applied the new statute without discussion of the legislative history and remanded the case with instructions to reinstate the action.

See also *Freeborn* v. *Smith*, 2 Wall. 160 (1865); *Moores* v. *National Bank*, 104 U. S. 625 (1882), where a state statute of limitations was construed by the State Supreme Court in a way contrary to the construction given theretofore by the lower federal court, and this Court followed the later construction; *Stephens* v.

Ultimately, in *Thorpe* v. *Housing Authority of the City of Durham*, 393 U. S. 268 (1969), the broader reading of *Schooner Peggy* was adopted, and this Court ruled that "an appellate court must apply the law in effect at the time it renders its decision." *Id.*, at 281. In that case, after the plaintiff Housing Authority had secured a state court eviction order, and it had been affirmed by the Supreme Court of North Carolina, *Housing Authority of the City of Durham* v. *Thorpe*, 267 N. C. 431, 148 S. E. 2d 290 (1966), and this Court had granted certiorari, 385 U. S. 967 (1966), the Department of Housing and Urban Development ordered a new procedural prerequisite for an eviction. Following remand by this Court for such further proceedings as might be appropriate in the light of the new directive, 386 U. S. 670 (1967), the state court adhered to its decision. 271 N. C. 468, 157 S. E. 2d 147 (1967).[18] This Court again granted certiorari. 390 U. S. 942 (1968). Upon review, we held that, although the circular effecting the change did not indicate whether it

*Cherokee Nation*, 174 U. S. 445 (1899), where the Court upheld a federal statute, containing retrospectivity language and conferring jurisdiction upon this Court over cases on review of actions of the Dawes Commission, enacted after rulings below that decrees of the courts in the Indian territories were final; *Dinsmore* v. *Southern Express Co.*, 183 U. S. 115 (1901), where the Court, relying upon *Schooner Peggy*, applied a statute, enacted while the case was pending on certiorari, to affirm the judgment of the lower court; *Watts, Watts & Co.* v. *Unione Austriaca*, 248 U. S. 9 (1918); *Dorchy* v. *Kansas*, 264 U. S. 286, 289 (1924); *Missouri ex rel. Wabash R. Co.* v. *Public Service Comm'n*, 273 U. S. 126 (1927); *Sioux County* v. *National Surety Co.*, 276 U. S. 238, 240 (1928); *Patterson* v. *Alabama*, 294 U. S. 600, 607 (1935).

[18] The Supreme Court of North Carolina held that since all "critical events" had occurred prior to the date of the circular, "[t]he rights of the parties had matured and had been determined before the directive was issued." 271 N. C., at 470, 157 S. E. 2d, at 149

was to be applied to pending cases or to events that had transpired prior to its issuance,[19] it was, nonetheless, to be applied to anyone residing in the housing project on the date of its promulgation. The Court recited the language in *Schooner Peggy,* quoted above, and noted that that reasoning "has been applied where the change was constitutional, statutory, or judicial," 393 U. S., at 282 (footnotes omitted), and that it must apply "with equal force where the change is made by an administrative agency acting pursuant to legislative authorization." *Ibid.* *Thorpe* thus stands for the proposition that even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect.

Accordingly, we must reject the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature.[20] While neither our decision in *Thorpe* nor our decision today purports to hold that courts must always thus apply new laws to pending cases in the absence of clear legislative direction to the contrary,[21] we

---

[19] In our first *Thorpe* opinion, however, we did note: "While the directive provides that certain records shall be kept commencing with the date of its issuance, there is no suggestion that the basic procedure it prescribes is not to be followed in all eviction proceedings that have not become final." *Thorpe* v. *Housing Authority of the City of Durham,* 386 U. S. 670, 673 (1967).

[20] The Fourth Circuit has declined to apply § 718 to services rendered prior to its enactment on the ground that "legislation is not to be given retrospective effect to prior events unless Congress has clearly indicated an intention to have the statute applied in that manner." *Thompson* v. *School Board of the City of Newport News,* 472 F. 2d 177, 178 (1972). The Fifth Circuit has done the same. *Johnson* v. *Combs,* 471 F. 2d 84, 86 (1972); *Henry* v. *Clarksdale Municipal Separate School Dist.,* 480 F. 2d 583, 585 (1973).

[21] Where Congress has expressly provided, or the legislative history had indicated, that legislation was to be given only prospective

do note that insofar as the legislative history of § 718 is supportive of either position,[22] it would seem to provide at least implicit support for the application of the statute to pending cases.[23]

## B

The Court in *Thorpe*, however, observed that exceptions to the general rule that a court is to apply a law in effect at the time it renders its decision "had been made to prevent manifest injustice," citing *Greene* v. *United*

effect, the courts, in the absence of any attendant constitutional problem, generally have followed that lead. See, for example, *Goldstein* v. *California*, 412 U. S. 546, 551–552 (1973); *United States* v. *Thompson*, 356 F. 2d 216, 227 n. 12 (CA2 1965), cert. denied, 384 U. S. 964 (1966).

[22] In *Johnson* v. *Combs*, the Fifth Circuit characterized the legislative history of § 718 as "inconclusive," 471 F. 2d, at 87. In *Thompson* v. *School Board of the City of Newport News*, the Fourth Circuit rejected the view that the legislative history could be read to support the applicability of § 718 to services rendered prior to its effective date, but did not find any explicitly stated legislative intent to the contrary. 472 F. 2d, at 178.

[23] The legislation that ultimately resulted in the passage of § 718 grew out of a bill that would have provided for the establishment of a $15 million federal fund from which successful litigants in school discrimination cases would be paid a reasonable fee "for services rendered, and costs incurred, *after the date of enactment of this Act.*" S. 683, § 11 (a), 92d Cong., 1st Sess. (1971) (emphasis supplied). The bill was reported out of the Senate Committee on Labor and Public Welfare as S. 1557, with the relevant clause intact in § 11. See S. Rep. No. 92–61, pp. 55–56 (1971). The section, however, was stricken in the Senate, 117 Cong. Rec. 11338–11345 (1971), and the present language of § 718 took its place. *Id.*, at 11521–11529 and 11724–11726. The House, among other amendments, deleted all mention of counsel fees. In conference, the fee provision was restored. S. Rep. No. 92–798, p. 143 (1972). Thus, while there is no explicit statement that § 718 may be applied to services rendered prior to enactment, we are reluctant specifically to read into the statute the very fee limitation that Congress eliminated.

*States,* 376 U. S. 149 (1964).[24] Although the precise category of cases to which this exception applies has not been clearly delineated, the Court in *Schooner Peggy* suggested that such injustice could result "in mere private cases between individuals," and implored the courts to "struggle hard against a construction which will, by a retrospective operation, affect the rights of parties." 1 Cranch, at 110. We perceive no such threat of manifest injustice present in this case. We decline, accordingly, to categorize it as an exception to *Thorpe*'s general rule.

The concerns expressed by the Court in *Schooner Peggy* and in *Thorpe* relative to the possible working of an injustice center upon (a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights.

---

[24] In *Greene,* the Court held that a claimant's right to recover lost earnings had become final as a result of the prior decision that the claimant had been wrongfully discharged, *Greene* v. *McElroy,* 360 U. S. 474 (1959), and of the District Court's order on remand. Accordingly, the Court ruled that his rights had matured under an earlier Department of Defense regulation, and declined to give retroactive effect to a new regulation that took effect while the claim was being processed. The inequity of a contrary holding was stressed by the Court:

"In a case such as the present, where the Government has acted without authority in causing the discharge of an employee without providing adequate procedural safeguards, we should be reluctant to conclude that a regulation, not explicitly so requiring, conditions restitution on a retrospective determination of the validity of the substantive reasons for the Government action—reasons which the employee was not afforded an adequate opportunity to meet or rebut at the time of his discharge." 376 U. S., at 162.

As noted, the Court, in *Thorpe* v. *Housing Authority of the City of Durham,* 393 U. S. 268 (1969), characterized *Greene* as an exception to the general rule of *Schooner Peggy,* "made to prevent manifest injustice." *Id.,* at 282, and n. 43.

In this case the parties consist, on the one hand, of the School Board, a publicly funded governmental entity, and, on the other, a class of children whose constitutional right to a nondiscriminatory education has been advanced by this litigation. The District Court rather vividly described what it regarded as the disparity in the respective abilities of the parties adequately to present and protect their interests.[25] Moreover, school desegregation litigation is of a kind different from "mere private cases between individuals." With the Board responsible for the education of the very students who brought suit against it to require that such education comport with constitutional standards, it is not appropriate to view the parties as engaged in a routine private lawsuit. In this litigation the plaintiffs may be recognized as having rendered substantial service both to the Board itself, by bringing it into compliance with its constitutional mandate, and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system.[26] *Brown* v. *Board of Education,* 347 U. S., at 494.

---

[25] "[F]rom the beginning the resources of opposing parties have been disproportionate. Ranged against the plaintiffs have been the legal staff of the City Attorney's office and retained counsel highly experienced in trial work. . . . Few litigants—even the wealthiest—come into court with resources at once so formidable and so suited to the litigation task at hand. . . .

"Moreover, this sort of case is an enterprise on which any private individual should shudder to embark. . . . To secure counsel willing to undertake the job of trial . . . necessarily means that someone—plaintiff or lawyer—must make a great sacrifice unless equity intervenes." 53 F. R. D., at 40.

[26] See Dept. of Health, Education, and Welfare, J. Coleman et al., Equality of Educational Opportunity (1966); United States Commission on Civil Rights, Racial Isolation in the Public Schools (1967). See also *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U. S. 205 (1972).

In *Northcross* we construed, as *in pari passu*, § 718 and § 204 (b) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3 (b), providing for an award of counsel fees to a successful plaintiff under the public accommodation subchapter of that Act. Our discussion of the latter provision in *Piggie Park* is particularly apt in the context of school desegregation litigation:

> "When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. A Title II suit is thus private in form only. When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." 390 U. S., at 401–402 (footnotes omitted).

Application of § 718 to such litigation would thus appear to have been anticipated by Mr. Chief Justice Marshall in *Schooner Peggy* when he noted that in "great national concerns . . . the court must decide according to existing laws." 1 Cranch, at 110. Indeed, the circumstances surrounding the passage of § 718, and the numerous expressions of congressional concern and intent with respect to the enactment of that statute, all proclaim its status as having to do with a "great national concern." [27]

---

[27] It is particularly in the area of desegregation that this Court in *Newman* and in *Northcross* recognized that, by their suit, plain-

The second aspect of the Court's concern that injustice may arise from retrospective application of a change in law relates to the nature of the rights effected by the change. The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional. See Greene v. United States, 376 U. S., at 160; Claridge Apartments Co. v. Commissioner, 323 U. S. 141, 164 (1944); Union Pacific R. Co. v. Laramie Stock Yards Co., 231 U. S. 190, 199 (1913). We find here no such matured or unconditional right affected by the application of § 718. It cannot be claimed that the publicly elected School Board had such a right in the funds allocated to it by the taxpayers. These funds were essentially held in trust for the public, and at all times the Board was subject to such conditions or instructions on the use of the funds as the public wished to make through its duly elected representatives.

The third concern has to do with the nature of the impact of the change in law upon existing rights, or, to state it another way, stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard. In Thorpe, we were careful to note that by the circular the "respective obligations of both HUD and the Authority under the annual contributions contract remain unchanged. . . . Likewise, the lease agreement between

tiffs vindicated a national policy of high priority. Other courts have given explicit and implicit recognition to the priority placed on desegregation litigation by the Congress. See Knight v. Auciello, 453 F. 2d 852, 853 (CA1 1972) and Lee v. Southern Home Sites Corp., 444 F. 2d 143, 145 (CA5 1971) (housing); Johnson v. Combs, 471 F. 2d, at 86 (schools); Miller v. Amusement Enterprises, Inc., 426 F. 2d 534, 537–538 (CA5 1970) (public accommodation); Cooper v. Allen, 467 F. 2d 836, 841 (CA5 1972) (employment).

the Authority and petitioner remains inviolate." 393 U. S., at 279. Here no increased burden was imposed since § 718 did not alter the Board's constitutional responsibility for providing pupils with a nondiscriminatory education. Also, there was no change in the substantive obligation of the parties. From the outset, upon the filing of the original complaint in 1961, the Board engaged in a conscious course of conduct with the knowledge that, under different theories, discussed by the District Court and the Court of Appeals, the Board could have been required to pay attorneys' fees. Even assuming a degree of uncertainty in the law at that time regarding the Board's constitutional obligations, there is no indication that the obligation under § 718, if known, rather than simply the common-law availability of an award, would have caused the Board to order its conduct so as to render this litigation unnecessary and thereby preclude the incurring of such costs.

The availability of § 718 to sustain the award of fees against the Board therefore merely serves to create an additional basis or source for the Board's potential obligation to pay attorneys' fees. It does not impose an additional or unforeseeable obligation upon it.

Accordingly, upon considering the parties, the nature of the rights, and the impact of § 718 upon those rights, it cannot be said that the application of the statute to an award of fees for services rendered prior to its effective date, in an action pending on that date, would cause "manifest injustice," as that term is used in *Thorpe,* so as to compel an exception of the case from the rule of *Schooner Peggy.*

### C

Finally, we disagree with the Court of Appeals' conclusion that § 718 by its very terms is inapplicable to the petitioners' request for fees "because there was no

'final order' pending unresolved on appeal," 472 F. 2d, at 331, when § 718 became effective, or on May 26, 1971, when the District Court made its award.

It is true that when the District Court entered its order, it was at least arguable that the petitioners had not yet become "the prevailing party," within the meaning of § 718. The application for fees had been included in their March 10, 1970, motion for further relief in the light of developments indicated by the decision two years before in *Green*. The Board's first plan was disapproved by the District Court on June 26. Its second plan was also disapproved but was ordered into effect on an interim basis on August 17 for the year about to begin. The third plan was ultimately approved on April 5, 1971, and the order allowing fees followed shortly thereafter.

Surely, the language of § 718 is not to be read to the effect that a fee award must be made simultaneously with the entry of a desegregation order. The statute, instead, expectedly makes the existence of a final order a prerequisite to the award. The unmanageability of a requirement of simultaneity is apparent when one considers the typical course of litigation in a school desegregation action. The history of this litigation from 1970 to 1972 is illustrative. The order of June 20, 1970, suspending school construction, the order of August 17 of that year placing an interim plan in operation, and the order of April 5, 1971, ordering the third plan into effect, all had become final when the fee award was made on May 26, 1971.[28] Since most school cases can be expected

---

[28] Since the finality of these orders is not contested, we are not called upon to construe the finality language as it appears in § 718. The only court that has dealt with the issue under this statute has held that the most suitable test for determining finality is appealability under 28 U. S. C. § 1291. See *Johnson* v. *Combs,* 471 F. 2d, at 87.

This Court has been inclined to follow a "pragmatic approach" to

to involve relief of an injunctive nature that must prove its efficacy only over a period of time and often with frequent modifications, many final orders may issue in the course of the litigation. To delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel, and discourage the institution of actions despite the clear congressional intent to the contrary evidenced by the passage of § 718. A district court must have discretion to award fees and costs incident to the final disposition of interim matters. See 6 J. Moore, Federal Practice ¶ 54.70 (5) (1974 ed.). Further, the resolution of the fee issue may be a matter of some complexity and require, as here, the taking of evidence and briefing. It would therefore be undesirable to delay the implementation of a desegregation plan in order to resolve the question of fees simultaneously. The District Court properly chose not to address itself to the question of the award until after it had approved the noninterim plan for achievement of the unitary school system in Richmond on April 5, 1971.

We are in agreement, however, with the dissenting judge of the Court of Appeals when he observed, 472 F. 2d, at 337, that the award made by the District Court for services from March 10, 1970, to January 29, 1971,

---

the question of finality. *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 306 (1962). And we have said that a final decision, within the meaning of § 1291, "does not necessarily mean the last order possible to be made in a case." *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148, 152 (1964); see *Cohen* v. *Beneficial Loan Corp.,* 337 U. S. 541, 545 (1949).

Without wishing affirmatively to construe the statute in detail in the absence of consideration of the issue by the lower courts, we venture to say only that the entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees in school desegregation cases. See C. Wright, Federal Courts § 101 (2d ed. 1970).

did not precisely fit § 718's requirement that the bene-
ficiary of the fee order be "the prevailing party."  In
January 1971 the petitioners had not yet "prevailed"
and realistically did not do so until April 5.  Conse-
quently, any fee award was not appropriately to be made
until April 5.  Thereafter, it may include services at
least through that date.  This, of course, will be attended
to on remand.

Accordingly, we hold that § 718 is applicable to the
present situation, and that in this case the District Court
in its discretion may allow the petitioners reasonable at-
torneys' fees for services rendered from March 10, 1970, to
or beyond April 5, 1971.  The judgment of the Court
of Appeals is vacated and the case is remanded for fur-
ther proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL and MR. JUSTICE POWELL took
no part in the consideration or decision of this case.