**FOUR WINDS FORWARDING, INC., Plaintiff,**

v.

**P.I.E. NATIONWIDE, INC., Defendant.**

**Civ. No. 86–1195–S.**

United States District Court, S.D. California.

Nov. 2, 1987.

Alan Wohlstetter, Denning & Wohlstetter, Washington, D.C., David Aitken, San Diego, Cal., for plaintiff.

James King, Luce Forward, Hamilton & Scripps, San Diego, Cal., Kim Mann, Shawn, Berger & Mann, Washington, D.C., Kevin Williams, Alexandria, Va., amicus curiae on behalf of Regular Common Carrier Conference.

William Pugh, Alexandria, Va., amicus curiae on behalf of National Motor Freight Traffic Ass'n.

## MEMORANDUM OF DECISION AND ORDER

EDWARD J. SCHWARTZ, Senior District Judge.

This matter came on for hearing before the court on September 21, 1987, on cross-motions by plaintiff and defendant for summary judgment. David Aitken and Alan Wohlstetter appeared for plaintiff, FOUR WINDS FORWARDING, INC., and James King and Kim Mann appeared on behalf of defendant, P.I.E. NATIONWIDE, INC. Kevin Williams appeared on behalf of the Regular Common Carrier Conference.

Upon review of all papers and documents filed, and following argument by counsel and for the reasons set forth below, the court grants partial summary judgment in favor of defendant.

### BACKGROUND

This case involves a dispute as to what rates should apply to shipments of military baggage and used household goods tendered by a freight forwarder to a common carrier. Plaintiff, a freight forwarder, claims it was overcharged on various shipments it received from the government and, in turn, tendered to defendant between May, 1984, and April, 1985. Defendant, a common carrier, in turn counterclaims for various shipments allegedly not paid in full by plaintiff.

There are three pertinent rates that a carrier can charge a freight forwarder. The first is the published tariff rate, available to anyone. The second is the rate negotiated between freight forwarders and common carriers under 49 U.S.C. § 10766

(formerly § 409). The third is the government tender rate which is agreed to between the government and the carriers pursuant to 49 U.S.C. § 10721 (formerly § 22). The negotiated § 10766 rates are invariably lower than the published tariff rates, and the § 10721 government tender rates are almost invariably lower than the § 10766 rates. Plaintiff and defendant had agreed to § 10766 rates. As between defendant and the government, § 10721 rates were agreed upon.

## THE ICC DECISIONS

Plaintiff contends that because it shipped goods on behalf of the government it is entitled to § 10721 government rates instead of § 10766 rates. Plaintiff bases its claim on the first two of the three ICC decisions which address this issue. The first ICC decision, *Ex Parte No. MC–107, Transportation of Government Traffic* ("1984 decision"), served May 16, 1984, ruled that carriers could charge freight forwarders the § 10721 government rates. The ICC reasoned that since the freight forwarders were acting on behalf of the government, the resulting savings would be passed through to the government, to the benefit of taxpayers.

Although the 1984 decision established the right of freight forwarders to use § 10721 government rates with carriers, it did not definitively resolve the issue of whether such rates were mandatory. The decision states that "if the shipments are tendered by someone acting on behalf of the government, the reduced rates *can* be offered" since freight forwarders "*may* be treated as the government." 1984 decision at 2–3, emphasis added. The decision envisioned bargaining between freight forwarders and carriers: "the freight forwarder can negotiate a lower rate from the motor carrier (under either a section 10766 contract or a section 10721 rate)." *Id.* at 4.

Faced with overcharge claims, a group of carriers including defendant petitioned the ICC for relief from the 1984 decision. The resulting *Ex Parte No. MC–107* decision ("1986 decision"), served July 11, 1986, clarified the 1984 decision by holding that the use of government rates was mandatory at the freight forwarder's option. In reference to the carrier's concerns over losing money, the ICC explained that carriers were not compelled to accept government tenders. Those carriers unwilling to bear the risks involved could leave the market.

Then a third ICC decision abruptly changed course. This *Ex Parte No. MC–107* decision ("1987 decision"), served February 25, 1987, held that "our 1986 (and 1984) decisions impermissibly interfered with motor carriers' contracts with freight forwarders pursuant to 49 U.S.C. § 10766 and was ill-advised. Accordingly, we [reverse] the 1986 decision." 1987 decision at 2. The ICC based its reversal on the determination that freight forwarders in fact were not agents of the government and were not obliged to "pass through" savings to the government. The 1987 decision, like the previous two, took effect upon the day of service without reference to any retroactive effect.

## RETROACTIVITY

■ Plaintiff argues that the 1984 decision gave it the right to use § 10721 rates. Although that decision was reversed by the 1987 decision, plaintiff maintains that the later decision took effect only when served and should not extend retroactively to the shipping contracts at issue. In *Bradley v. Richmond School Board*, 416 U.S. 696, 711–721, 94 S.Ct. 2006, 2016–2021, 40 L.Ed.2d 476 (1974), the Supreme Court addressed the question of what law should apply when the law affecting a pending case had changed. The court held that "[a] court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711, 94 S.Ct. at 2016. This applies equally to changes made by an administrative agency. *Id.* at 715, 94 S.Ct. at 2018. Thus, this court must apply the 1987 decision unless doing so would either (1) violate the intent of the 1987 decision, or (2) result in manifest injustice.

■ The first exception to the *Bradley* rule, whether there is statutory or legislative intent contrary to retroactivity, does not apply to this case. The 1987 decision simply took effect on the day served without explicit reference to retroactivity one way or the other. The *Bradley* rule presumes retroactivity absent a positive contrary intent. Thus, "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Id.*

Plaintiff, however, argues that retroactive effect would result in a manifest injustice because its right to the § 10721 government rates matured after the 1984 decision. This argument fails because the record shows that the 1984 decision confused the trucking industry so as to destabilize the maturity of rights. In its 1987 decision, the ICC described the 1986 decision as having "*clarified* that freight forwarders tendering government traffic are entitled to ... § 10721 tender rates." 1987 decision at 1 (emphasis added). This reflects the unsettled law between the 1984 and 1986 decisions which gave neither freight forwarders nor carriers mature rights other than those upon which they actually agreed.

Contrary to the 1984 decision's vision of freight forwarders negotiating lower rates, plaintiff, after having goods shipped, simply asserted its right to the government rates by discounting the freight bills to the § 10721 rate or by filing an overcharge claim if the bill had already been paid at the negotiated § 10766 rate. Plaintiff provided no explanation of the discounts unless pressed. Deposition of Ernest Farr, plaintiff's auditor, at 45. Not even at opportunities such as the negotiation of § 10766 rates was the intended use of § 10721 rates discussed. Deposition of Ella Helders, plaintiff's manager, at 99.

These efforts of bald assertion in place of negotiation brought little success. Only a few carriers in the industry (but not defendant) paid plaintiff's overcharge claims. *Id.* at 124–126. Similarly, a few carriers (but not defendant) for reasons unknown explicitly agreed to let plaintiff use § 10721 government rates. Deposition of Farr at 67–68. The uncertainty over the applicable rate continued, however, for most carriers.

Most interesting, plaintiff's own market behavior reflects a certain lack of confidence in the availability of § 10721 rates. If one carrier explicitly offered § 10721 rates that were higher than another carrier's unoffered § 10721 rates the first carrier would get the business. *Id.* at 79, 81, 94. In a hypothetical situation where carrier A had lower § 10766 rates but no § 10721 rates on file and carrier B had higher § 10766 rates but an even lower § 10721 rate on file plaintiff would choose carrier A. *Id.* at 143–44. Such "hedging" by plaintiff supports the conclusion that retroactive application of the 1987 decision will not under a *Bradley* analysis disturb matured rights.

## CONCLUSION

■ Because of the complexity of the process by which freight forwarders bid with the government to obtain military traffic, it is unclear to what extent plaintiff relied upon the use of § 10721 rates when tendering bids. Any such reliance would, however, be unreasonable as a matter of law until the 1986 decision. The 1986 decision clarified the law and matured plaintiff's right to claim § 10721 rates on any government freight henceforth tendered to carriers. Until then, the § 10721 rates would apply only if they were the product of agreement between the parties.

Some of the bills of lading at issue do display § 10721 rates. Apparently plaintiff's agents were instructed to place § 10721 rates on the bills. Deposition of Farr at 36. These notations make ambiguous at what rate these particular contracts were formed. Summary judgment is not appropriate where the intent of the parties is unclear. *Jewel Companies v. Payless Drug Stores Northwest*, 741 F.2d 1555, 1566 (9th Cir.1984).

Defendant has brought a motion for summary judgment on its counterclaim for bills allegedly unpaid by plaintiff. Plaintiff does not contest its liability aside from the

issue of what rates control. The above analysis applies with equal force to the counterclaim contracts. Unambiguous contracts, i.e. those that do not refer to § 10721 rates, should be paid at the negotiated § 10766 rate. Ambiguous contracts should be paid at this time except as to the portion of ambiguity. Thus, if a contract refers to § 10721 rates at least that much money is owed by plaintiff to defendant. If defendant prevails on the fact question of whether a § 10766 contract was formed, then defendant can obtain the difference between the § 10766 rates and the § 10721 rates.

The parties to this case have stipulated that the court enter a "conceptual" order setting forth the framework for calculations of money owing on actual contracts. In light of that stipulation, the amounts should be calculated with the following concepts in mind. Plaintiff will not be entitled to § 10721 rates on unambiguous contracts entered into prior to the July 11, 1986 service date of the 1986 decision. Ambiguous contracts, i.e. those that refer to § 10721 billing rates, remain at issue because there exists a material issue as to whether the parties contracted at § 10721 or § 10766 rates. Thus, on ambiguous contracts in the claim and counterclaim defendant is now entitled only to the § 10721 rates. Defendant's entitlement to § 10766 rates on ambiguous contracts remains to be litigated.

For the foregoing reasons, plaintiff's motion for summary judgment is denied; defendant's motions for summary judgment and for summary judgment on its counterclaim are granted in part.

IT IS SO ORDERED.