**Paul DICKSON, Plaintiff-Appellant,**

v.

**Joseph A. CALIFANO, Jr., Successor to David Mathews, Secretary of Health, Education and Welfare, Defendant-Appellee.**

No. 77–3054.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1978.

Decided Dec. 12, 1978.

As Amended on Denial of Rehearing Feb. 15, 1979.

Lawrence H. Brenner, Toledo, Ohio, Charles R. Hollen, Tampa, Fla., Jones, Giha, Schell, Brenner, Toledo, Ohio, for plaintiff-appellant.

William D. Beyer, U. S. Atty., Patrick J. Foley, Asst. U. S. Atty., Toledo, Ohio, for defendant-appellee.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and PECK, Senior Circuit Judge.

EDWARDS, Circuit Judge.

Appellant Dickson appeals from denial of black lung disability benefits by the Secretary of Health, Education and Welfare, and affirmance of that denial by a United States District Judge who held it was supported by substantial evidence. These decisions have been entered in spite of the facts that 1) the Administrative Law Judge found that Dickson was suffering from a disabling, chronic lung condition, 2) government documentary evidence shows that he worked in the mines during each of 13 calendar years and 43 calendar quarters, thus apparently being entitled to the 10-year statutory presumption, 30 U.S.C. § 921(c)(1) (1976) and 20 C.F.R. § 410.-490(b)(3) (1978), and 3) appellant had presented evidence from a Board certified physician who read X-rays as showing pneumoconiosis and found him totally disabled thereby.

We reverse for award of benefits.

## THE TEN–YEAR PRESUMPTION ISSUE

The Administrative Law Judge, the Secretary and the District Judge all held in effect that appellant was not entitled to the presumption which Congress created for the benefit of miners who had worked 10 years in the mines, 30 U.S.C. § 921(c)(1) (1976) and 20 C.F.R. § 410.490(b)(3) (1978).

Our review of this record shows that this conclusion is not supported by substantial evidence.

Appellant, now 60 years old, testified that he had gone to work in the mines in 1936 and had been employed as a miner until 1953, when he developed breathing difficulty and his doctor advised him to leave the mines. He worked in nonmining employment until 1974 when, he testified, he could not work any more due to breathing trouble. This application was first filed May 17, 1971. Initial denial by the Secretary was vacated for reconsideration under the 1972 Black Lung Benefits Act.

Appellant testified that he was born October 6, 1918, "got thru the second grade in school" and started working in the mines at 18 in 1936 and worked until 1954. He testified that he worked "part time" in the early years due to frequent shutdowns of the "truck mines" which employed him:

Q. Before you started working full-time, did you have some other part-time job that you were doing?

A. Well, in them little old truck mines they'd run awhile and they'd shut down awhile. You'd work awhile around the mines, and then you'd go find another job, whatever you could find doing—construction work, or timber work, or whatever you could find doing. Why, that's what you done.

Q. Could you give me an estimate, sir, of approximately how much time you spent in the coal mines and how much time in this other work that you did before that?

A. Well now, then, in the wintertime you'd get 5 or 6 months.

Q. Of coal mining?

A. Of coal mining. And then in the summertime, why, them little truck mines would be out.

Q. Would it be about half and half then, would you say?

A. A little around half and half.

He also testified that, starting in the 1940's, he worked full time for 11 or 12 years as a coal loader. He described his job as follows:

Q. Is that the only job you did?

A. Well, a coal loader—He drilled coal. He drilled and shot his own coal, and he set his own timbers, he loaded his coal, and he laid the last 12 foot of the track.

The official records of Social Security payments show 43 separate Social Security employment tax payments by 32 different employers in 42 different quarters extending over 13 calendar years, as follows:

## ANALYSIS OF PAUL DICKSON'S EARNINGS BASED ON SOCIAL SECURITY ADMINISTRATION RECORDS
### (R — 67 through 74)

| Year | Company | Record Page | Quarters 1 | 2 | 3 | 4 | Total Quarters for Year |
|------|---------|-------------|---|---|---|---|-------------------------|
| 1941 | Wise Coal | 67 | | | X | | 1 |
| 1942 | Burtons-Ford | 67 | | | | X | 1 |
| 1943 | Fraser-Brace | 67 | | | | X | |
| | 35-0603175 * | 67 | | X | X | X | 4 |
| | Std. Banner | 67 | X | | | | |
| 1944 | Fraser-Brace | 67 | X | X | | | |
| | Brooks | 68 | | | | X | 4 |
| | Myers | | | X | X | | |
| 1945 | Brooks | 68 | X | | | | |
| | Lay & Hall | 68 | X | X | | | |
| | Richmond | 68 | X | | | | |
| | Divina | 68 | | | X | X | 4 |
| | Mountain | 69 | | | X | | |
| | 54–1357535 * | 69 | | X | | | |
| | 54–1448333 * | 69 | | X | | | |
| | 54–1455390 * | 69 | | | | X | |
| 1946 | Mountain | 69 | | X | X | | |
| | 54–1455390 * | 69 | X | | | | |
| | 54–0456822 * | 69 | | | X | | 4 |
| | Adkins & Kern | 70 | | | | X | |
| 1947 | Adkins & Kern | 70 | X | | | | |
| | Lattimore | 70 | | | X | | |
| | Sproles | 70 | | X | | | 4 |
| | Mountain | 69 | X | X | X | X | |
| 1948 | Mountain | 69 | X | X | X | | 4 |
| | Harry's | 70 | | | | X | |
| 1949 | Mountain | 69 | | | X | X | 4 |
| | Dry Fork | 70 | X | X | | | |
| 1950 | Mountain | 69 | | | X | X | 3 |
| | Barker | 71 | X | | | | |
| 1951 | Sullivan | 71 | X | | | | |
| | Moore & Son | 71 | | | X | | |
| | Phillips | 71 | X- | | | | |
| | 54–0545325 * | 71 | | | | X | 4 |
| | T. A. Jerry | 70 | | | | X | |
| | Yates & Stallord | 71 | | X | X | X | |
| 1952 | Hall & Son | 70 | | X | | | |
| | Peery | 70 | | X | X | | 2 |
| | 54–0548447 * | 70 | | X | | | |
| 1953 | T. A. Hall | 70 | | X | X | | |
| | Star | 71 | | | X | | 3 |
| | T. A. Perry | 71 | X | | | | |
| | Stallord & Yates | 71 | X | | | | |

Total Quarters in which Income Received, Coal Employment  42

* The Records contain only the employer's number, not its name.

We have likewise examined the more detailed Social Security earnings statements from individual employers which were introduced before the ALJ. As the District Judge noted, the ALJ clearly misconstrued these records by failing to observe that for a number of quarters, where only minimal earnings were shown by a particular employer, there were also earnings reported by one or more additional employers. It also appears to us that the ALJ and the District Judge failed to take into account the great difference in hourly wages paid in the mines in the early years of appellant's employment when compared to either the last years of his mining employment, or, of course, the present.

The 10-year presumption upon which appellant relies provides:

(3) With respect to a miner who meets the medical requirements in subparagraph (1)(ii) of this paragraph, he will be presumed to be totally disabled due to pneumoconiosis arising out of coal mine employment, or to have been totally disabled at the time of his death due to pneumoconiosis arising out of such employment, or his death will be presumed to be due to pneumoconiosis arising out of such employment, as the case may be, if he has at least 10 years of the requisite coal mine employment. 20 C.F.R. § 410.-490(b)(3) (1978).

We also have available a detailed statement of legislative purpose applicable to the 15-year and 10-year presumptions created by the 1972 Act:

### REBUTTABLE PRESUMPTION

The bill reported to the Senate, H.R. 9212 as amended, establishes a rebuttable presumption that a totally disabled coal miner who worked in an underground mine for 15 years or a surface miner who was employed under environmental conditions similar to those experienced by underground miners, is totally disabled by pneumoconiosis if he has a totally disabling respiratory or pulmonary impairment, even if he has an X-ray which cannot be interpreted as positive for complicated pneumoconiosis. The Secretary of Health, Education and Welfare may rebut the presumption if (1) he establishes that the miner does not, or did not, have pneumoconiosis, or (2) that the miner's disability did not arise out of, or in connection with, his work in a coal mine. Lay evidence alone will not be sufficient to raise the presumption of pneumoconiosis.

*For purposes of new section 411(c)(4), the term "totally disabling respiratory or pulmonary impairment" means an impairment which prevents the miner from engaging in gainful mining employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time.*

The Committee intends that the burden will be placed on the claimant to prove the existence of pneumoconiosis in cases where the miner worked fewer than fifteen years in a coal mine, but that judgment will be allowed to be exercised in determining the validity of claims in such cases, including the determination that the miner's disability is not due to pneumoconiosis or that it is not related to his employment in a coal mine. *A miner's work history reflecting many years of mining work, though short of fifteen, and the severity of his impairment, shall also be considered.* It is further intended that a mere showing of a respiratory or pulmonary impairment will not be sufficient to establish a claim for benefits.

It must be made clear by the Committee, however, that it expects and intends that miners with fewer than fifteen years in the mines who are totally disabled and who have X-ray evidence of pneumoconiosis other than complicated pneumoconiosis, who are now eligible for benefits, will remain so under the Committee amendments.

The fifteen year period is not intended to be an inflexible standard serving as a bar to successful claims. It merely reflects the testimony of the Surgeon General in 1969, who stated:

"For work periods less than 15 years underground, the occurrence of pneumoconiosis among miners appears to be spotty and showed no particular trend. For work periods greater than 15 years underground, there was a linear increase in the prevalence of the disease with years spent underground."

Though there may be no particular trend, there will be worthy cases and the committee intends that these cases will be decided consistent with the remedial nature of these amendments.

S.Rep. No. 743, 92d Cong., 2d Sess., 11–12, *reprinted in* [1972] U.S.Code Cong. & Ad.News 2305, 2316–17 (emphasis added).

■ Our review of this record shows conclusively that appellant's principal (if not sole) occupation was deep mining for in excess of 10 years, and that he clearly was so engaged with much more than "some regularity" and "over a substantial period of time." As indicated earlier, we hold that the findings to the contrary on the part of the Secretary and the District Judge are not supported by substantial evidence.

The ALJ found as a fact that appellant "is suffering from a disabling chronic lung condition. . . . "

Appellant is entitled to the 10-year presumption that his disability arose from work in the mines if he passed the ventilatory tests set forth in 20 C.F.R. § 410.-490(b)(1)(ii) (1978). These test results show as follows:

1. Date of test: 5/9/73 (R–89)
   Values: $FEV_1$ 2.755
   MVV 66.4
2. Date of test: 9/14/73 (R–100): Two Trials
   Values: $FEV_1$ 2.58; 2.75
   MVV 66.13; 67.77
3. Date of test: 2/6/75 R–121, 120): Two Trials
   Values: $FEV_1$ 1.175 liters;
   1.000 liters

MVV 22 liters/min.;
   22 liters/min.

Of these, only the test of 2/6/75 clearly serves to meet the § 410.490(b)(1)(ii) criteria. Since decision of this case by the Secretary and the District Court, however, Congress has adopted the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239 § 2, 92 Stat. 96 (*amending* 30 U.S.C. § 921 (1976)), which has the effect of making the interim presumptions of the 1972 Act fully applicable to claims filed after June 30, 1973, and making said presumptions likewise applicable to claims (like this one) filed before said date, but decided thereafter. Under these circumstances, appellant is entitled to the presumption that his disabling lung condition is due to pneumoconiosis occasioned by work in the mines, and hence, is clearly entitled to disability benefits as of February 6, 1975.

While this might require remand of appellant's claims as to earlier years (*see Begley v. Mathews*, 544 F.2d 1345 (6th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1684, 52 L.Ed.2d 380 (1976)) we also note that appellant is entitled to full benefits on an entirely different basis under the Black Lung Disability statute, 30 U.S.C. § 921(c)(3) (1976) and 20 C.F.R. § 410.-490(b)(1) (1978).

The applicable statutory language is as follows:

(3) if a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if

diagnosis had been made in the manner prescribed in clause (A) or (B), then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be, 30 U.S.C. § 921(c)(3) (1976).

The applicable language in the regulation is as follows:

(b) *Interim presumption.* With respect to a miner who files a claim for benefits before July 1, 1973, and with respect to a survivor of a miner who dies before January 1, 1974, when such survivor timely files a claim for benefits, such miner will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of his death, or his death will be presumed to be due to pneumoconiosis, as the case may be, if:

(1) One of the following medical requirements is met:

(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428); or . . . . 20 C.F.R. § 410.490(b)(1)(i) (1978).

On the face of the matter, of course, these provisions appear to support appellant's claim that if appellant presents a single X-ray which is read by qualified medical authority as establishing the existence of pneumoconiosis, "such miner *will* be presumed to be totally disabled due to pneumoconiosis." The Secretary's response to this is that the parenthetical reference in 20 C.F.R. § 410.490(b)(1)(i) (1978) to § 410.-428 makes the granting of the presumption of disability purely discretionary:

Section 410.428(a)(1) states that a finding of the existence of pneumoconiosis as defined in section 410.110(*o*)(1) *may* be made under the provisions of section 410.-414 if a chest roentgenogram (X-ray) establishes the existence of pneumoconiosis classified as Category 1, 2, 3, A, B, or C according to specified standards. As seen by the word "may" this finding is left to the Administrative Law Judge's discretion.

Since in this instance the Secretary is interpreting the relationship of his own regulations, this argument would be highly persuasive absent contrary and controlling legislative history or statutory expression. Here we find both.

In the Senate Report on the 1972 Act quoted above, we find this paragraph:

It must be made clear by the Committee, however, that it expects and intends that miners with fewer than fifteen years in the mines who are totally disabled and who have X-ray evidence of pneumoconiosis other than complicated pneumoconiosis, who are now eligible for benefits, will remain so under the Committee amendments.

\* \* \* \* \* \*

Though there may be no particular trend, there will be worthy cases and the committee intends that these cases will be decided consistent with the remedial nature of these amendments.

S.Rep. No. 743, *supra* at 2317.

Clearly in this case appellant has "X-ray evidence of pneumoconiosis other than complicated pneumoconiosis." The X-ray of August 6, 1973,[1] was read by two physicians who also had the benefit of examining appellant. Both found that it established the existence of pneumoconiosis which qualified under the standards of 20 C.F.R. § 410.428 (1978). One of these physicians, Dr. Straughn, was a Certified Reader of Coal Miners' X-rays.

We recognize, of course, that the Secretary's reliance in disregarding this evidence is based upon a subsequent reading of this

---

1. While the original cutoff date for the interim presumptions was July 1, 1973, we take judicial notice that the slowly progressive character of black lung disease serves to make this X-ray evidence fully applicable. *See Begley v. Mathews*, 544 F.2d 1345 (6th Cir.) *cert. denied*, 430 U.S. 985, 97 S.Ct. 1684, 52 L.Ed.2d 380 (1976).

same X-ray by a reader chosen by the Secretary. This reader marked his chart negative as to pneumoconiosis and positive as to emphysema, but entered no comment after the question, "If this film was read by another physician and your interpretation is not the same, can you suggest an explanation for the different conclusions reached?" The record also shows that this doctor did not examine appellant. *See Burchett v. Mathews,* 575 F.2d 1189 (6th Cir. 1978), and *Ansel v. Weinberger,* 529 F.2d 304 (6th Cir. 1976).

■ We believe the statute and legislative history cited above allow the Secretary to deny the presumption after a claimant has presented X-ray evidence from a Certified Black Lung X-ray Reader only by rebutting either the evidence of pneumoconiosis or the evidence of disability. The Secretary, of course, in this case concedes disability and this court has held that a negative X-ray reading by a nonexamining physician does not constitute substantial evidence to rebut positive evidence furnished by a positive X-ray reading by a qualified examining physician.

■ Further, on this same issue, if doubt remained about the conclusion expressed above, it is resolved by the recently adopted 1978 Amendments:

> In any case in which there is other evidence that a miner has a pulmonary or respiratory impairment, the Secretary shall accept a board certified or board eligible radiologist's interpretation of a

chest roentgenogram which is of a quality sufficient to demonstrate the presence of pneumoconiosis submitted in support of a claim for benefits under this title if such roentgenogram has been taken by a radiologist or qualified technician, except where the Secretary has reason to believe that the claim has been fraudulently represented. In order to insure that any such roentgenogram is of adequate quality to demonstrate the presence of pneumoconiosis, and in order to provide for uniform quality in the roentgenograms, the Secretary of Labor may, by regulation, establish specific requirements for the techniques used to take roentgenograms of the chest. Pub.L. No. 95–239, *supra* at § 5.[2]

Since there is "other evidence that [appellant] has a pulmonary or respiratory impairment," and there is no evidence of fraud, the Secretary's acceptance of Dr. Straughn's findings of pneumoconiosis is required.

The judgment of the District Court is vacated and the case is remanded for the allowance of benefits.

**2.** *See also* H.R.Rep. No. 151, 95th Cong., 2d Sess., 20–21, *reprinted in* [1978] U.S.Code Cong. & Ad.News 465, 484–85:

> The Department of Labor acknowledges that more than 60 percent of the X-rays which are submitted as positive for pneumoconiosis are re-read by the government's consulting radiologists as negative. As a general proposition reasonable men can differ, and this holds true for radiographic interpretations as well as for other fields of endeavor. The imperfection of this art is also indicated in cases of miners whose X-rays were interpreted as negative and who have, on autopsy, been revealed to have suffered from varying stages of pneumoconiosis.
>
> There is little reason, as a matter of policy, for the government to interpose panels of

second-guessers, particularly where the original interpreter of a claimant's X-ray was a qualified radiologist. The Committee therefore intends that this provision be retroactively applied to denied and pending claims as well as to new ones. If, in the case of a claim by a living miner, an X-ray is objectively determined not to be of acceptable quality, the Secretary shall request that another X-ray be taken. Where fraud is suspected, the Committee expects the Secretary to take such action as may be appropriate, but he shall specifically describe the reasons upon which this suspicion is based.
>
> Because of administrative omissions in this regard, the amendment is made retroactive to December 30, 1969.