Golden L. MOORE, Appellant,

v.

Joseph A. CALIFANO, Jr., Secretary of
Health, Education and
Welfare, Appellee.

No. 77–3537.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 12, 1979.

Decided Oct. 27, 1980.

728

Byron Lee Hobgood, Richard E. Hibbs, Franklin, Gordon & Hobgood, Madisonville, Ky., for appellant.

George J. Long, U. S. Atty., James H. Barr, Michael Tilley, Louisville, Ky., Dwight L. Thomas, Asst. Regional Atty., Atlanta, Ga., for appellee.

CORNELIA G. KENNEDY, Circuit Judge.

Golden Moore, a 65–year old former coal miner, appeals from a judgment of the District Court affirming the denial of black lung benefits under the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901, *et seq.* Claimant retired in November 1970 after working as a mechanic in coal mines approximately 25 years. He applied for black lung benefits in January 1971, thus falling under Part B of the Black Lung Benefit Act, 30 U.S.C. § 921, *et seq.* At that time he also filed an application for disability benefits under the Social Security Act based upon arteriosclerotic cardiovascular disease. Social Security disability benefits were awarded in 1973. Following an administrative hearing in 1975, claimant was denied black lung benefits. The Administrative Law Judge's decision was approved by the Appeals Council and became the final decision of the Secretary of Health, Education and Welfare. The District Court found that the Secretary's decision denying black lung benefits was supported by substantial evidence. We agree with the District Court's conclusion and affirm.

Mr. Moore has an extensive medical history. He was hospitalized on more than one occasion for his heart problem. Most of his medical care was received from various doctors at the Trover Clinic in Madisonville, Kentucky. He has had numerous chest x–rays. A 1968 chest x–ray by Dr. Selby Coffman, a radiologist, at the Trover Clinic and an "A" reader of coal miner's chest x–rays certified by the National Institute of Occupational Safety and Health was said to be normal. The report of the 1968 x–ray stated that there was no change since a 1966 x–ray. An April 3, 1969 x–ray by Dr. William Rogers, a radiologist, also at the Trover Clinic, revealed infiltrate in the right lung compatible with bronchopneumonia. An April 7, 1969 x–ray, also read by Dr. Rogers, stated that Mr. Moore's condition was unchanged from the April 3 x–ray. An October 10, 1969 x–ray was stated to contain no evidence of active pulmonary or pleural disease by Dr. R. E. Yadon, another

radiologist with the Trover Clinic. A March 8, 1971 x–ray taken by Dr. Coffman was interpreted by him as positive for simple pneumoconiosis, category 2/1q. That x–ray was submitted for review to a certified "B" reader, Dr. Dinuris Ciklai Adler, who reported it negative for pneumoconiosis. Two other "B" readers, Drs. Dennis and Rosenstein, examined the March 8, 1971 x–ray, and also interpreted it as negative for pneumoconiosis. Finally, x–rays were taken June 5, 1974 by Dr. Neil Calhoun, a specialist in general practice. Dr. Calhoun interpreted these x–rays as showing a pulmonary fibrotic process extending outward from the hilar areas in all lung fields. The lateral view was described as showing thickening typical of emphysema. Dr. Calhoun concluded that the x–rays were typical of coal miner's pneumoconiosis, category 1, sub–classification R. These x–rays were reread by Dr. Robert M. Coleman, a radiologist, as showing pulmonary fibrosis with pneumoconiosis not ruled out. "B" readers Dennis and Rosenstein interpreted the June 5, 1974 x–rays as negative for pneumoconiosis. The Administrative Law Judge concluded that the x–ray evidence did not establish pneumoconiosis.

Claimant had pulmonary function studies February 10, 1970, August 25, 1971, August 9, 1973, and June 5, 1974. A medical consultant to the Bureau of Hearing and Appeals reviewed these studies and reported that the June 5, 1974 tests were unsatisfactory. No tracings were provided for the February 10, 1970 studies as required by the regulations. Nor did a cooperation statement accompany them. The August 25, 1971 and August 9, 1973 studies did not meet the interim criteria of 20 C.F.R. § 410.490 under which total disability due to pulmonary disease may be presumed. The June 5, 1974 studies did meet the table of values; however, this was one year after the statutory jurisdictional cutoff date and the Administrative Law Judge relied on the 1973 tests which were closer to the cutoff date as more persuasive of plaintiff's condition at that time. The pulmonary function studies did not therefore establish the presence of a chronic respiratory or pulmonary impairment.

The more difficult question is whether claimant produced such other evidence of totally disabling chronic lung disease that he was entitled to the rebuttable presumption provided by § 921(c)(4). That section provides that if a claimant has worked 15 years in the coal mines and has a totally disabling chronic respiratory or pulmonary impairment, it is presumed that he is totally disabled from pneumoconiosis. The presumption may be rebutted only if it is established that he does not have pneumoconiosis or that his respiratory or pulmonary impairment did not arise out of or in connection with employment in the coal mine. Negative x–rays and negative pulmonary studies may not be used to rebut the presumption. *Ansel v. Weinberger*, 529 F.2d 304, 309–10 (6th Cir. 1976). The burden is, however, on claimant to establish that he has the totally disabling chronic respiratory or pulmonary impairment.

The Administrative Law Judge found, after considering the medical evidence and Mr. Moore's testimony, that he did not have significant pulmonary disfunction as of June 30, 1973 and that his symptoms are primarily associated with heart disease. That finding may not be set aside if it is based upon substantial evidence viewing the record as a whole, *Carroll v. Califano*, 619 F.2d 1157 (6th Cir. 1980); *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976); *Ross v. Richardson*, 440 F.2d 690, 694 (6th Cir. 1971), even if we would have taken a different view of the evidence were we trier of the facts. *Ross v. Richardson, supra*, 440 F.2d at 694, *King v. Celebrezze*, 341 F.2d 108, 109 (6th Cir. 1968).

Medical reports submitted to the Secretary show that claimant was examined on August 25, 1971 by Dr. C. M. Van Hooser, an internist with the Trover Clinic. Moore complained of chest pain relieved by nitroglycerin. He denied having paroxysmal nocturnal dyspnea (periodic recurring labored or difficult breathing accompanied by pain). He stated he was short of breath after climbing stairs or walking a couple of

blocks. He had a cough productive of white sputum. Physical examination of his chest showed that his lungs were free of wheezes, rales, and rhonchi. Dr. Van Hooser's diagnosis was arteriosclerotic heart disease with angina pectoris, class II. Dr. Van Hooser examined claimant August 9, 1973. His report of that examination states that Mr. Moore's lungs were clear to auscultation and percussion, with no wheezes, rales, or rhonchi. Again, his diagnosis was arteriosclerotic heart disease with angina pectoris. Dr. Van Hooser performed pulmonary function studies on August 9, 1973. A chest x–ray was taken that day by Dr. Coffman who reported claimant's lungs were clear.

On October 15, 1973, claimant was examined by Dr. Charles R. Fisher, another internist at the Trover Clinic. He found inspiratory and expiratory wheezing with no rales. His disagnosis was arteriosclerotic heart disease–compensated; angina on exertion; chronic lung disease; chronic bronchitis; and pulmonary fibrosis. On June 4, 1974, claimant was examined by Dr. William G. West, a general practitioner. He reported that Mr. Moore's chest was clear to percussion and auscultation with diminished breath sounds bilaterally. He interpreted an x–ray taken that date as compatible with coal miner's pneumoconiosis and stated that Mr. Moore was disabled from coal mining due to pneumoconiosis. As stated above, the x–ray was later read by two "B" readers as negative for pneumoconiosis.

Dr. Neal Calhoun, a specialist in general practice, examined claimant on June 5, 1974. Breath sounds were stated to be low, distant, hard to hear, with fine moist rales with wheezes. His report states that these signs are characteristic of severe chronic pulmonary disease. Dr. Calhoun concluded that plaintiff had complicated pneumoconiosis as well as heart disease.

■ We agree with the District Court that there is substantial evidence to support the Secretary's finding that claimant did not suffer from "a totally disabling chronic respiratory or pulmonary impairment" prior to July 1, 1973. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 21 L.Ed.2d 842 (1971). Dr. Van Hooser's reports, which are completely negative with respect to any lung disease and ascribe a different cause for claimant's disability, supply adequate support for the Secretary's conclusion. Although Dr. Van Hooser was primarily concerned with claimant's heart problem, he was sufficiently interested in his lungs to order pulmonary function tests and chest x–rays.

Claimant argues that pneumoconiosis is a progressive disease and that the Secretary was required to give consideration to the results of examinations after the cutoff date. *Begley v. Mathews*, 544 F.2d 1345 (6th Cir. 1976), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1684, 52 L.Ed.2d 380 (1977). In *Begley*, we held that when ventilatory tests made reasonably proximate to the July 1, 1973 cutoff date establish entitlement to a presumption of disability, such evidence should be carefully weighed "to determine whether or not it establishes that his breathing capacity was below the standard set in 20 C.F.R. § 410.490 on or before June 30, 1973. If so, the presumption of total disability accorded by the just cited regulation should be granted to him." 544 F.2d at 1354. Where, as here, however, ventilatory studies made in August 1973 measured plaintiff's breathing capacity as exceeding the standard set in 20 C.F.R. § 410.490, consideration of the 1974 studies is not needed to determine claimant's breathing capacity a year before.

■ There is no reason for concluding that the Administrative Law Judge did not consider the reports of examinations made subsequently to the July 1, 1973 cutoff date. He refers to the fact that there were diagnoses of chronic lung disease which can be found only in the reports dated after the cutoff date. It appears that he chose to rely upon Dr. Van Hooser's reports in reaching his conclusion. Moreover, it would be reasonable to conclude that claimant's condition worsened after the cutoff date. Dr. Van Hooser found no rales, wheezes, or

rhonchi in August of 1973 while Dr. West, who examined claimant October 15, 1973, found wheezing but no rales. Dr. Calhoun's report, on the other hand, states that there were both wheezing and rales, conditions which his report states are characteristic of coal miner's pneumoconiosis.

Claimant also urges that the Secretary was required to find that claimant's heart condition was caused by pneumoconosis. Dr. Calhoun's report states that there is "a good possibility in all likelihood or it may be possible that the heart disease resulted from a high pulmonary system resistance caused by coal miner's pneumoconiosis." In view of the inconclusive nature of the opinion as well as the circumstance that both the x-ray and ventilatory studies, which Dr. Calhoun stated were positive for pneumoconiosis, were discredited, the Administrative Law Judge was not required to make this finding.

The 1977 amendments to the Act prohibit the rereading of an x-ray read positive for pneumoconiosis where that x-ray is of good quality and has been read by a board certified or a board eligible radiologist. Since the x-rays here were so reread, we must consider whether those amendments have retroactive effect.

While Mr. Moore's appeal was pending in this Court, the Black Lung Benefits Reform Act of 1977 was enacted March 1, 1978. Among other changes, these amendments liberalized the evidentiary requirements for proving the presence of black lung disease. In particular, section 5 of the Reform Act (codified at 30 U.S.C. § 923(b)) requires the Secretary to accept a board certified radiologist's reading of an x-ray where there is other evidence of a pulmonary or respiratory impairment. Rereading of x-rays by "B" readers is no longer permitted unless the Secretary has reason to believe that the claim has been fraudulently misrepresented. The issue for this Court is whether or not these amendments should apply to a claim which had been decided by the Secretary of

HEW, but was pending on appeal to the courts, when the 1977 Reform Act was passed.

This Circuit has answered the question inconsistently. In *Dickson v. Califano*, 590 F.2d 616 (6th Cir. 1978), this Court held the claimant was entitled to a ten-year statutory presumption under the 1977 Reform Act and that the 1977 Reform Act prevented the Secretary from rereading x-rays which the claimant's examining doctors had said showed complicated pneumoconiosis. In *Hill v. Califano*, 592 F.2d 341 (6th Cir. 1979), this Court affirmed a denial of benefits. It did not apply the 1977 Reform Act to the case before it, but rather noted that the claimant could reapply under the 1977 Reform Act.* Most recently, this Court in *Back v. Califano*, 593 F.2d 758 (6th Cir. 1979), refused to apply the 1977 Reform Act to a claim decided by the Secretary but pending before the courts on appeal when the amendments were enacted. It held it was not a fact-finding body and thus could not apply the new provisions, but the claimant could refile with either the Secretary of HEW or the Secretary of Labor under the Reform Act. *Dickson* was distinguished on the bases that in *Dickson* the Administrative Law Judge had found that the claimant was suffering from a disabling chronic lung condition and that *Dickson* had presented evidence from a board certified physician who read Dickson's x-rays as showing pnemoconiosis and found him totally disabled thereby while in *Back* there were no such findings.

The distinction is strained. In either case, the Administrative Law Judge must make a finding regarding disability and weigh the credibility of the evidence. The 1977 Reform Act only prohibits rereading of the x-rays if the x-rays meet the Secretary's standards, if the x-rays are read by a board certified radiologist, and if there is no evidence of fraud. To apply the 1977 Reform Act, the Court still implicitly had to find facts.

---

* *But see Miniard v. Califano*, 618 F.2d 405 (6th Cir., 1980) (applying 30 U.S.C. § 902(b) as amended by the 1977 Act without discussing that this section had been so amended).

This Court must apply the law in effect at the time it renders its decision unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *See Cort v. Ash*, 422 U.S. 66, 76–77, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975); *Bradley v. Richmond School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801).

One court found applying the 1977 Reform Act to a claim decided before the act was passed would result in manifest injustice. *See United States Steel Corp. v. Gray*, 588 F.2d 1022, 1030 (5th Cir. 1979). Other courts have held that the statutory scheme or the legislative history indicate the amendments should not be applied by the courts in cases which were decided by the Secretary before the statute was passed. *See Moore v. Harris*, 623 F.2d 908 (4th Cir., 1980); *Robertson v. Califano*, 601 F.2d 1276, 1279 & n.2 (4th Cir. 1979) (denied benefits but claimant may reapply to the agency under 1977 Reform Act); *Beck v. Mathews*, 601 F.2d 376, 379 n.4 (9th Cir. 1978) (refused to remand in light of the 1977 Reform Act; claimant will have to reapply); *Freeman v. Califano*, 600 F.2d 1057, 1060 (5th Cir. 1979); *Yakim v. Califano*, 587 F.2d 149, 150–51 (3d Cir. 1978); *Treadway v. Califano*, 584 F.2d 48, 49–52 (4th Cir. 1978); *Ohler v. Secretary of HEW*, 583 F.2d 501, 506 (10th Cir. 1978) (did not apply 1977 Reform Act; claimant may reapply under it). *But see Director, Office of Workers' Compensation Programs, Dept. of Labor v. Clinchfield Coal Co.*, 574 F.2d 1167, 1169 (4th Cir. 1978) (per curiam) (remanded to Department of Labor for expedited treatment under the 1977 Reform Act).

The language of the statute is of little help. It merely states that "The provisions of this Act shall take effect on the date of enactment of this Act." Act of March 1, 1978, Pub.L. No. 95–239, § 20(a), 92 Stat. 106. (Other subsections gave special enactment dates in the event the separate legislation providing for funding by an excise tax on coal was not passed.)

The statutory scheme, however, suggests that Congress did not intend the courts to apply the 1977 Reform Act to cases pending before them, but rather intended that only the relevant agencies would apply the 1977 Reform Act from the date of enactment. The 1977 Reform Act provides for review upon request of the claimant of all pending and denied claims filed under Part B by either the Secretary of HEW or the Secretary of Labor. The Secretary of HEW is to notify every Part B claimant who has been denied benefits or has a claim pending that he may either request review by the Secretary of HEW on the existing record taking into account the 1977 Reform Act or may apply to the Secretary of Labor where he may adduce additional evidence, again taking into account the 1977 Reform Act. If the Secretary of HEW finds upon review the claimant is entitled to benefits he is to transfer the claim to the Department of Labor for payment. *See* Act of March 1, 1978, Pub.L. No. 95–239, § 15, 92 Stat. 103 (codified at 30 U.S.C. § 945). Any award of benefits under this review taking into account the 1977 amendments is limited to benefits for a period which begins no earlier than January 1, 1974. Act of March 1, 1978, Pub.L. No. 95–239, § 15, 92 Stat. 103 (codified at 30 U.S.C. § 945(c)).

A court by applying the 1977 Reform amendments rather than requiring the claimant to refile with the agency of his choice would disrupt this scheme in several ways. First, the court could only remand the claim to the agency from whence it came, that is, the Secretary of HEW. The claimant could not choose review by the Secretary of Labor where he could adduce more evidence. Second, applying the 1977 Reform Act would limit the retroactivity of benefits to January 1, 1974 and no earlier, whereas allowing the claimant to proceed with his Part B claim under the pre–1977 Reform Act law would give the claimant the opportunity to request full retroactive benefits. Third, applying the 1977 Reform Act involves fact finding, something this Court is not equipped to do. *See Beck, supra*, 601 F.2d at 379 n.4; *Freeman, supra*, 600 F.2d at 1060; *Back, supra; Yakim, supra; Treadway, supra.*

The legislative history, to the extent it speaks to the issue presented here, supports the proposition drawn from the legislative scheme that the amendments were not intended to be applied retroactively by the courts on cases which had been decided by the Secretary of HEW before the Reform Act was passed. The Court cited in *Dickson* language to the contrary from House Report No. 151, 95th Cong., 1st Sess. (March 31, 1977), at 20–21, as published in [1978] U.S.Code Cong. & Admin.News [237, 256–57], which stated, "Because of administrative omissions in this regard [rereading of x–rays], the amendment is made retroactive to December 30, 1969." *See* 590 F.2d at 623 n.2. Unfortunately, the *U. S. Code Congressional & Administrative News* does not publish the entire legislative history.

The House passed a bill which specifically had a section providing that the section pertaining to x–ray rereading would be retroactive until December 30, 1969, but that benefits payable because of the new amendments would not be paid for any period earlier than the effective date of the statute.[1]

This provision did not survive the legislative process. The Senate bill had no provision for retroactive effect of any of the provisions. It limited retroactive award of benefits under the amendments to any period after January 1, 1974. It merely provided that the Act would take effect generally upon the date of enactment. *See* S.Rep. No. 95–209, 95th Cong., 1st Sess. (May 16, 1977), at 21. Indeed, the report states that, "[i]t is not intended that any changes in existing regulations be applied retroactively to previously adjudicated claims." *Id.* at 14. Application of the changes would be appropriate to claims still in the adjudicatory process, but the report defines "finally adjudicated as denied" as having exhausted the administrative remedies leaving only the option to let the decision stand or seek judicial review. *Id.* at 16.

The Conference bill, which was passed by both houses without any changes[2] followed the Senate version by allowing payments of benefits retroactively under the amendments to January 1, 1974, but not providing for the provisions themselves to be retroactively applied. Rather, it had just a general provision that the amendments shall be effective on the date of enactment. *See* Act of March 1, 1978, Pub.L. No. 95–239, 95th Cong., 2d Sess. (Feb. 2, 1978), at 22, 28, *reprinted in* [1978] U.S.Code Cong. & Admin.News, 308, 315, 321.

Congress thus failed to make any specific provision for retroactive application of the amendments to cases pending on appeal before the courts. Rather, Congress intended to provide for agency review of all pending and denied Part B claims by the Secretary of HEW or the Secretary of Labor. Indeed, the House Report indicates that the ill–fated House bill provision for retroactive application was only concerned with retroactive application of the amendment by the agencies.[3] Significantly, as Representative Perkins presented the House bill to the House, he stated that if, in the case of a live miner, an x–ray is objectively determined to be of unacceptable quality, the *Secretary shall request that another x–ray be taken. See* 123 Cong.Rec. H7709 (daily ed. July 25, 1977) (emphasis added).

Members of both Houses were concerned about payment for black lung benefits under the new provisions. The legislative his-

1. *See* 123 Cong.Rec. H9610, H9613 (daily ed. Sept. 19, 1977) (also published in J. House Representatives 1941, 1946 (daily ed. Sept. 19, 1977)). In addition, *see* H.R.Rep. No. 95–151, 95th Cong., 1st Sess. (March 31, 1977), at 20–21, 25–26, *reprinted in* [1978] U.S.Code Cong. & Admin.News, 237, 256–57, 261–62.

2. *See* 124 Cong.Rec. S1448 (daily ed. Feb. 7, 1978); H1029 (daily ed. Feb. 15, 1978).

3. *See* H.R.Rep. No. 95–151, 95th Cong., 1st Sess. (March 31, 1977), at 2, *reprinted in* [1978] U.S.Code Cong. & Admin.News, 237, 238 (one of the problems addressed was "[t]he desirability of requiring a *reprocessing* of denied claims under Part B of Title IV") (emphasis added); *id.* at 8, [1978] U.S.Code Cong. & Admin.News 244 ("the Social Security Administration will be required to allow all claims" with respect to a proposed new provision granting benefits to all miners who worked thirty years or more in the mines).

tory is replete with intentions to transfer the liability from the taxpayer (via the Secretary of HEW paying out of the U.S. Treasury) to the coal industry (via payments administered by the Secretary of Labor from coal operators, other employers, or a trust fund established by a tax on coal). Supporters of the bill the House passed stated that it would transfer liability from the taxpayer to the coal operators, would guarantee re–examination of all past claims denied by HEW or Department of Labor, would prohibit retroactive payment of benefits under the new amendments, and would require the Secretary of HEW to review each claim denied or pending under Part B, taking into account the new amendments.[4]

The Senate bill required denied and pending Part B and Part C claimants be notified of their right of review under the statute which could be accomplished by simply re-filing under Part C. *See* S.Rep. No. 95–209, 95th Cong., 1st Sess. (May 16, 1977), at 3, 15–16. The Senators were also concerned about agency review of denied and pending claims and transferring the burden to the coal industry.[5] Under the Senate bill, benefits payable under the agency review taking into account the new provisions would only be payable retroactively for a period no earlier than January 1, 1974 as payments out of the trust fund may only be made after that date. *See* S.Rep. No. 95–209, 95th Cong., 1st Sess. (May 16, 1977), at 16.[6]

The Conference bill retained a provision for automatic review by the Secretary of HEW or by the Secretary of Labor. *See* H.R.Rep. No. 95–864, 95th Cong., 2d Sess. (Feb. 2, 1978), at 20, *reprinted in* [1978] U.S.Code Cong. & Admin.News 308, 314. For purposes of payment of benefits, all reviewed claims are to be treated like Part C claims (under jurisdiction of the Secretary of Labor) and payments will be made by coal mine operators, other employers, or the trust fund, *see id.* at 22, [1978] U.S.Code Cong. & Admin.News at 315, which accomplishes the oft–stated objective to transfer the burden from paying for the benefits from taxpayer to the coal industry, as some of the opponents conceded.[7]

All discussion of the Conference bill indicated that old claims would be reviewed, taking into account the new provisions, when the HEW or the Department of Labor reviewed the claim. *See* H.R.Rep. No. 95–864, 2nd Sess. (Feb. 2, 1978), at 20–21 *reprinted in* [1978] U.S.Code Cong. & Admin.News 308, 314; 124 Cong.Rec. S1443–44 (daily ed. Feb. 7, 1978) (statement of Sen. Randolph); *id.* at S1446 (statement of Sen. Javits).

Congress was clearly concerned that black lung benefits be paid by the coal industry rather than the U.S. Treasury. It provided for automatic review by either the Secretary of HEW or the Secretary of Labor for any pending or denied Part B claim (and for review by the Secretary of Labor of any denied Part C claim). If such a

**4.** *See* 123 Cong.Rec. H9617 (daily ed. Sept. 19, 1977) (statement of Rep. Flood); *id.* at H9618 (statement of Rep. Buchanan); *id.* at H9621 (statement of Rep. Giaimo); *id.* at H9623 (statement of Rep. Bevill); *id.* at H9624, H9627–28 (statement of Rep. Perkins); *id.* at H9630 (statement of Rep. McDade).

**5.** *See Hearings Before the Subcomm. on Labor of the Comm. on Human Resources*, Senate, 95th Cong., 1st Sess. (April 4, 6, 1977), at 147 (question of Sen. Randolph and answer by Mr. Elisburg of the Department of Labor) (any retroactivity of new standards promulgated by Department of Labor to denied Part C cases would increase administrative costs and caseload at the Department of Labor); *id.* at 165 (statement of Richard Warden of HEW) (under the House bill, the Social Security Administra-

tion would be required to reopen Part B which would result in additional expenditures).

**6.** In addition, *see* statements made during debate in the Senate, 123 Cong.Rec. S12518 (daily ed. July 21, 1977) (statement of Sen. Randolph); *id.* at S12543 (statement of Sen. Clark); *id.* at S12544 (statement of Sen. Huddleston); *id.* (statement of Sen. Williams).

**7.** In addition to statements cited above, *see* 124 Cong.Rec. S1444 (daily ed. Feb. 7, 1978) (statement of Sen. Randolph); *id.* at S1445 (statement of Sen. Williams); *id.* at S1446 (statement of Sen. Javits); *id.* at H1023 (daily ed. Feb. 15, 1978) (statement of Rep. Perkins); *id.* at H1025 (statement of Rep. Thompson); *id.* at H1027 (statement of Rep. Erlenborn); *id.* at H1029 (statement of Rep. Bevill).

claim would be allowed, benefits would not be payable for any period earlier than January 1, 1974 and the payments would be made by coal operators, other employers, or the trust fund established by an excise tax on coal. That the retroactivity provision of the House bill did not survive the conference and that Congress wanted the reviewed claims to be treated as Part C claims (30 U.S.C. § 931, *et seq.*, for claims filed after December 31, 1973) for which any benefits awarded would be paid by the coal industry and not the U.S. Treasury are strong indications that Congress did not intend courts, in their review of claims which were denied before the 1977 Reform Act was enacted, to apply the new amendments.·

This Court concludes, as have most of the other courts which have considered this question, that the legislative history and the statutory scheme direct that the 1977 Reform Act not be applied for the first time by this Court on appeal and that remand to the Secretary of HEW would not be proper. The claimant is free to refile his claim with the agency of his choice (HEW or Department of Labor) as provided in 30 U.S.C. § 945.

The judgment of the District Court is affirmed.

MERRITT, Circuit Judge, dissenting.

I agree with the Court that the 1977 Amendments should not be applied retroactively, but I disagree that the claimant is not entitled to the § 921(c)(4) presumption. I think it is clear that this man has a totally disabling lung disease and that the evidence to the contrary is insubstantial.

Claimant Moore is a 65-year-old ex-coal miner who worked in underground coal mines for almost a quarter of a century until his retirement in November of 1970. On January 19, 1971, he applied to the Secretary of HEW for black lung benefits.

Claimant submitted copious evidence of totally disabling pneumoconiosis to the administrative law judge. Claimant testified that he cannot exert himself because of shortness of breath, from which he has suffered since 1962. He also testified that he coughs up thick sputum. Reports by Dr. Selby Coffman, Jr. and Dr. Neil Calhoun interpreted x-rays as positive for simple pneumoconiosis (black lung). Two pulmonary function studies showed pneumoconiosis. Reports of two physicians who both personally examined the claimant indicate that he has a chronic disabling lung disease.

According to one of these physicians, Dr. Neil Calhoun:

With the patient undressed to the waist we immediately see that this patient's chest is markedly deformed with chronic lung disease and we note deep cavities · between the patient's clavicles, neck and shoulder muscles on either side indicating that the bony thorax has been elevated, enlarged and drastically deformed due to chronic lung disease ... [B]reath sounds with inspiration are low, distant, hard to hear and at the end of the inspiratory cycle the patient has some fine moist rales and with expiration the breath sounds are also low, distant, hard to hear and last only a short duration and are wheezy at the end of the respiratory cycle. All of the changes we have just described are characteristic of severe, chronic, pulmonary disease.

According to ... [pulmonary function] studies [taken at our request] the patient is disabled according to HEW by their own standards as set forth in a table under "What Constitutes Total Disability By Pneumoconiosis" .... [W]e are certain from the history and physical examination and pulmonary function studies and chest x-rays that this patient has coal miner's pneumoconiosis that is causing him disability 100%.

The record also contains reports containing negative rereadings of the same x-rays, two negative pulmonary function studies and reports that claimant suffers from a disabling heart condition. On the basis of the negative readings, the negative pulmonary function studies, and reports of claimant's heart condition, the ALJ and our Court have found that claimant had not

proven the existence of a totally disabling chronic respiratory or pulmonary impairment that would invoke the § 921(c)(4) presumption.

The portion of the record on which the Court relies is insubstantial. It consists of negative x–rays, negative pulmonary studies, and reports concerning claimant's heart condition. Where there is substantial evidence of totally disabling chronic lung disease, these first two types of evidence cannot alone be used to prevent the § 921(c)(4) presumption from arising. *See Conn v. Harris*, 621 F.2d 228 (6th Cir. 1980); *Morris v. Mathews*, 557 F.2d 563, 565–66 (6th Cir. 1977).

The record does contain several reports that indicate claimant had a disabling heart condition. Dr. Calhoun in his report indicated, however, that

> [r]egardless of this patient's heart disease ... it is obvious ... that this patient's chronic lung disease ... is ... crippling and disabling this patient 100%.

> It is unfortunate that this patient has heart disease also but it is a good possibility in all likelyhood [sic] or it may be possible that this patient's heart disease has developed secondary to a high pulmonary system resistance caused by coal miner's pneumoconiosis that is causing him disability 100%.

I interpret this to mean that pneumoconiosis is the primary cause of disability. There is no medical evidence in the record contradicting such an affirmation. Even assuming that claimant is totally disabled *due to heart disease*, none of the reports on heart disease state that pulmonary impairment has *not* caused total disability.

I do not agree with the Court that Van Hooser's reports constitute substantial evidence that no disabling lung disease existed before June 30, 1973, when set alongside the reports of Drs. West, Fisher and Calhoun. Moore came to Van Hooser complaining of heart trouble. Van Hooser did not look specifically for lung disease, so he did not find it. Nor did he look specifically for the cause of the heart disease. On the other hand, West, Fisher and Calhoun examined Moore for the distinct purpose of determining whether he had lung impairment. West and Calhoun both stated unequivocally that Moore has totally disabling, chronic lung disease. Fisher stated that Moore has chronic lung disease without commenting on disability.

I do not see where the record indicates that Van Hooser was a "treating" as opposed to a mere "examining" physician. Nor does the record reveal that Van Hooser was any more familiar with Moore's health than was Calhoun. In fact, the record suggests just the opposite. Calhoun was the treating physician (p. 157). Consequently, it simply is not reasonable for the Secretary to accept one doctor's opinion who was not looking for the disease in question when there are three other doctors who specifically state the disease exists.

I do not think there is any inherent conflict between the reports of Drs. West, Fisher and Calhoun on the one hand, and those of Dr. Van Hooser. A plausible synthesis of these reports is that, as of the Van Hooser examination of 1973, Moore suffered from a chronic respiratory impairment that manifested itself only through a totally disabling heart condition and perhaps also shortness of breath. This respiratory impairment worsened by October 1973, when Dr. Fisher observed wheezing. Finally, by the summer of 1974, both Drs. Calhoun and West detected rales and wheezes. Dr. Calhoun also noted outward physical deformities. There is no direct and unequivocal statement in Van Hooser's reports that expressly contradicts the West/Fisher/Calhoun diagnoses. We cannot assume, contrary to other substantial evidence, that lung impairment did not exist simply because Van Hooser did not record it in his reports. Under this interpretation of the record, uncontradicted medical evidence shows that Moore had a heart impairment before June 30, 1973, and that this

impairment was caused by chronic lung disease. Accordingly, I would award benefits.