727 F.2d 542
 PETROU FISHERIES, INC., International Proteins Corporation
and Atlantic Shippers of Baltimore, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents.
 No. 83-4119.
 United States Court of Appeals,
Fifth Circuit.
 March 23, 1984.
 
 Sessions, Fishman, Rosenson, Boisfontaine & Nathan, J. David Forsyth, New Orleans, La., Augello, Pezold & Hirschmann, Huntington, N.Y., for petitioners.
 Charles A. Stark, Atty., I.C.C., Barry Grossman, John P. Fonte, Dept. of Justice, Washington, D.C., for respondents.
 Esmond Phelps, II, New Orleans, La., John A. Daily, Philadelphia, Pa., for Baltimore & Ohio R.R. Co., et al., intervenors.
 Petition for Review of an Order of the Interstate Commerce Commission.
 Before CLARK, Chief Judge, POLITZ and JOHNSON, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 Whether the market dominance requirement of the Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act)[1] should be applied retroactively to proceedings commenced before enactment of the 4R Act is the issue presented to this Court. We hold that the market dominance requirement should not be applied retroactively and, hence, we reverse the Interstate Commerce Commission's (ICC) decision and remand for further proceedings consistent with this opinion.[2]
 
 I. FACTS AND COURSE OF PROCEEDINGS
 
 2
 The dispute in this action arose from the movement of fifty-two carloads of water-soaked fishmeal. In August 1972, a six-alarm fire broke out in the warehouse of petitioner Atlantic Shippers of Baltimore, Inc. at Canton, Maryland. Firefighters poured tons of water into the building and the fishmeal within the building was soaked. Petitioner International Proteins Corporation purchased the damaged fishmeal in an effort to salvage it. Since no east coast facilities were available to process the damages fishmeal, it was shipped by railroad to the plant of Petrou Fisheries, Inc., in Empire, Louisiana, for reprocessing and removal of excess moisture.
 
 
 3
 The railroads originally quoted the shippers a rate of approximately $17.86 per net ton, based on a commodity description of "fertilizer tankage." The Penn Central Railroad subsequently determined that the commodity should be considered "fishmeal" and the shippers were rebilled at what is termed the column commodity rate for fishmeal, approximately $20.06 per net ton. Finally, the railroads, claiming that the column commodity rate only applied to shipments in closed-topped cars according to tariff restrictions, rebilled the shipment on the basis of the class rate, which rate included, inter alia, fishmeal. The class rate was approximately $51.05 per net ton.
 
 
 4
 The railroads applied the class rate to the original track scale weight of the moisture laden shipment and determined a total line-haul charge of $145,378. On advice of counsel, the shippers paid the railroads $41,836; this amount being based on the shippers' argument that the charges assessed against them were unjust and unreasonable according to ICC precedent. The amount paid reflected shippers' contentions as to what was a just and reasonable prescription for the movement, after applying the formula prescribed by the ICC in previous cases involving similar circumstances.
 
 
 5
 After hearing evidence presented in written statement form, the ICC, by decision of an administrative law judge (ALJ), concluded that the shippers were correct in their assertion that the line-haul charges were unreasonable and unjust. The ALJ agreed that the class rate was unjust and unreasonable as applied to the total weight of the rail shipment. Applying ICC precedent, the ALJ granted a reduced rate on the excess water portion of the shipment. The ALJ's decision as originally published, stated that the line-haul charges were to be $76,132.41. After the decision was issued, the ICC served a notice to all parties changing certain numbers in the ALJ's calculation of a reasonable rate, due to a mathematical error. The result was a total rate prescription for the movement of $101,468.81. Freight charges assessed by the railroads in excess of $101,468.81 were found to be unjust and unreasonable.
 
 
 6
 Petitioners pursued two administrative appeals of the ALJ's decision before the ICC seeking to lower the rate that was prescribed by the ALJ. The ICC affirmed the ALJ's decision in all respects and adopted it as its own on April 14, 1976. The ICC stated that the ALJ's findings "were proper and correct in all material respects." Upon the second administrative review, a petition for reconsideration of the ICC's decision was denied and the affirmance of the ALJ's decision was allowed to stand. As a result of the affirmed decision, the railroads were "authorized and directed to waive the collection of the outstanding line-haul transportation charges involved to the extent that they exceed charges of $101,468.81."
 
 
 7
 During this same time period, the railroads commenced an action in a federal district court for the collection of the outstanding freight charges. When the ICC's decision was administratively final, the shippers commenced an action in the same court to set aside the ICC's decision. The shippers argued that the operative ICC decision was improper in that the rate prescribed for the movement by the ICC was too high based on ICC precedent and case law. The two actions were consolidated and then the parties cross-moved for summary judgment, the issue being the validity of the ICC's decision.
 
 
 8
 A decision on the cross-motions for summary judgment was rendered by the district court on February 19, 1981. The district court ordered that the ICC's order with respect to the line-haul freight charges should be vacated and the matter remanded to the ICC for further proceedings. The portion of the ALJ's decision dealing with the prescribed rate was found to be lacking in that it failed to articulate a rational basis for rejection of the shipper's argument that use of the class rate in prescribing a rate was, itself, unjust, unreasonable and unlawful. The ICC was sustained on the remaining portions of its decision and no appeal was taken on those issues.
 
 
 9
 Significantly, the district court's decision recognized a change in substantive law that occurred during the pendency of the administrative proceedings. The district court directed that certain sections of the 4R Act passed in 1976 required the ICC, on remand, to apply the Interstate Commerce Act as amended rather than the law in effect at the time the proceeding was instituted in 1974. The district court stated that the 4R Act "amended the Interstate Commerce Act so that now the Commission is required to make a finding of market dominance over a service before it can find a rate for railroad service to be unreasonable."
 
 
 10
 Following the district court's decision, the shippers moved for a rehearing on the judgment and order insofar as it directed the ICC to apply the amended Interstate Commerce Act in determining the reasonableness of the line-haul charges. The district court, upon reargument, did amend its opinion and judgment so that the determination of what law to apply on remand was left to the ICC.
 
 
 11
 On remand to the ICC the ICC permitted further statements from the shippers and railroads. Finally, by decision served December 29, 1982, the ICC ruled that the original complaint before it was to be dismissed. The ICC determined that the applicable law on remand was the Interstate Commerce Act as amended by the 4R Act. The ICC interpreted the 4R Act to require the shippers to prove the railroad's market dominance over the subject railroad movement. Finding that the shippers had not sustained the burden of proving market dominance, the ICC declined to rule on the merits of the shippers' arguments as were originally presented in July 1974. This ruling had the result of reinstating line-haul charges in the amount of $145,378, an amount twice held to be unreasonable and unjust by the ICC. This appeal followed.
 
 
 12
 II. SHOULD THE 4R ACT BE APPLIED RETROACTIVELY?
 
 
 13
 Generally, in reviewing an agency's action, we accord great deference to the agency, recognizing the special skill enjoyed by the agency in areas of its technical expertise. See, Aberdeen & Rockfish Railroad Company v. United States, 682 F.2d 1092, 1096 (5th Cir.1982). Nonetheless, courts have recognized that such deference is not due the agency's decision when the issues do not fall within the agency's field of technical expertise. Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). As in the instant case, when the court is presented with issues of pure statutory construction, we accord little deference to the agency's decision, since the agency possesses no special skill in statutory interpretation. With these precepts in mind, we proceed to the merits.
 
 
 14
 The United States Supreme Court held in Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or [unless] there is statutory direction or legislative history to the contrary."[3] Id. 94 S.Ct. at 2016. The ICC concluded that nothing in the statutory language or the legislative history of the 4R Act indicates congressional intent to limit the statute to prospective application, and that the shippers in the instant case would not suffer "manifest injustice" from retroactive application of the 4R Act. Hence, the ICC held that Bradley compelled the agency to apply the 4R Act retroactively to the instant case, and, thus, to dismiss the shipper's claim because of the railroad's lack of market dominance. Appellants contend that the ICC erred by holding that the market dominance standard of the 4R Act should be applied retroactively to proceedings commenced prior to the 4R Act's enactment. They maintain that retroactive application of the 4R Act violates the legislative intent underlying the 4R Act and results in manifest injustice.
 
 
 15
 A. Legislative History and Statutory Language
 
 
 16
 A thorough review of the legislative history of the 4R Act and its express provisions yields little assistance to this Court in resolving the retroactivity issue. Indeed, it is unclear whether Congress ever expressly addressed the retroactivity issue. In this respect, the ICC's decision to apply the 4R Act retroactively does not contravene Bradley, since there is no express "statutory direction or legislative history to the contrary." However, an analysis of the 4R Act's purposes reveals implicit congressional intent against retroactive application of the 4R Act's market dominance requirement.
 
 
 17
 Prior to 1976, the ICC had unfettered authority to review all railroad rates. During this time period, Congress clearly concluded that market forces were inadequate stimuli for controlling prices and, hence, provided legislation resulting in extensive regulation for railroad rates. Not until 1976 did Congress change its position on regulation and enact legislation (the 4R Act) designed to deregulate the railroad industry in areas in which effective competition exists. Congress concluded that many of the justifications for extensive, cumbersome regulation no longer existed due to the rise in competitive, alternative modes of transportation.[4]
 
 
 18
 Significantly, the challenged rate before the ICC in this case resulted from a railroad movement in 1972--years before Congress had concluded that market forces were sufficient to govern rail rates. In 1972, there was not an environment of a deregulated market that set rail rates. Instead, when the movement at issue in this case took place, shippers were accustomed to stringent rate regulation by the ICC. Railroads were not permitted in 1972 to contract for rates with shippers as they are now. Moreover, even though the railroads quoted the shippers two lower rates before ultimately billing them at the assailed rate, all parties knew in 1972 that it was not competition that shaped rail rates, but tariffs and the overriding supervision of the ICC to set "just and reasonable rates." Market dominance, as an artificial substitute for free market competition, was still four years away.
 
 
 19
 Simply put, a review of the Interstate Commerce Act and its subsequent amendments clearly reveals two very differing policies on railroad rate regulation, policies based upon the existence and nonexistence of effective competition. The statutory scheme undoubtedly evinces congressional intent for prospective application of the 4R Act. To apply the 4R Act's market dominance requirement retroactively would ignore the clear purpose of the statute and would undercut prior congressional intent requiring stringent regulation prior to 1976. As the Supreme Court noted as early as 1947, "[r]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." SEC v. Chenery, Corp., 332 U.S. 194, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947), quoted in Retail Wholesale and Apartment Store U v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972). As we have seen, retroactive application of the 4R Act would violate the statutory design clearly expressed in Congress' amendments to the Interstate Commerce Act.
 
 B. Manifest Injustice
 
 20
 Appellants contend that retroactive application of the 4R Act results in manifest injustice. As a result, they claim the ICC's decision must fall under the manifest injustice language in Bradley.
 
 
 21
 The origin and justification of the general rule requiring application of the law in effect at the time of the appellate decision are to be found in the language of the United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801). There, Chief Justice Marshall wrote that if, on appellate review, a change of law occurred after the rendering of the judgment appealed from but before the decision of the appellate court, the new law must be obeyed. But, that general statement was tempered with the following words: "It is true that in mere private cases between individuals a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of the parties...." Id. at 110. In Bradley, the Supreme Court traced the progeny of the Schooner Peggy case and observed "that exceptions to the general rule that a court is to apply a law in effect at the time it renders its decision 'had been made to prevent manifest injustice.' " Bradley, 94 S.Ct. at 2018. Bradley goes on to note that "the concerns expressed by the court in Schooner Peggy and in a [subsequent case] relative to the possible working of an injustice center upon (a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." Id. 94 S.Ct. at 2019. Examination of these criteria in the instant case makes it apparent that the 4R Act should be applied prospectively only.
 
 1. Nature and Identity of the Parties
 
 22
 In the case sub judice, the action before the ICC can only be considered, in the words of Chief Justice Marshall, a "mere private case between individuals." Schooner Peggy, 1 Cranch at 110. The Bradley case considered the application of new law to a public entity. In this proceeding, the litigants before the ICC appear simply as parties to a contract of carriage dispute. Moreover, this is not a broad policy case in which one of the litigants is acting in the nature of a private attorney general to uphold a substantial right of the community at large. The issue before the ICC is merely the establishment and proper articulation of a reasonable rate for a single transportation service that occurred over ten years ago. The shippers in this case are even to be contrasted with complainants before the ICC such as large public utilities purchasing hundreds of train loads of coal to fire their electric generating stations. In those cases, the utilities have been held to be "private entities" coming within the exceptions to the Bradley rule. See, Iowa Power and Light Company v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir.1981); Iowa Public Service v. ICC, 643 F.2d 542, 549 (8th Cir.1981); see also, Burlington Northern, Inc. v. United States, 679 F.2d 915 (D.C.Cir.1982). Hence, since the dispute involves private parties this court "will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of the parties...." Schooner Peggy, 1 Cranch at 110.
 
 2. Nature of the Parties' Rights
 
 23
 In Bradley, the Supreme Court stressed that in reviewing a retroactivity issue this Court should be mindful of the effect its decision would have on the parties' rights. In this case, the shippers have already proven to the ICC's satisfaction that the rate charged to them was unlawful and unreasonable. The ICC twice upheld that position on administrative appeals. If the shippers are now forced to attempt to prove market dominance more than ten years after the subject movement, they will find themselves in the ironic position of having demonstrated that the rate was unreasonable, but having lost on the retroactively imposed jurisdictional issue. Such a result, as we have seen, would undercut the legislative intent underlying the 4R Act and would reimpose a rate that the ICC has twice concluded was unjust and unreasonable. We conclude that it would work a manifest injustice to the rights previously established by the shippers if we imposed retroactivity.
 
 
 24
 3. Nature of the Impact of the Change of Law
 
 
 25
 "The third concern has to do with the nature of the impact of the change in law upon existing rights, or, to state it another way, stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." Bradley, 94 S.Ct. at 2020. In finding for retroactive application of new law in Bradley, the Supreme Court emphasized that "no increased burden was imposed" on the parties and that there was "no change in the substantive obligation of the parties." Id. 94 S.Ct. at 2021. The instant case is distinguishable, because application of the market dominance standard greatly enhances the shipper's burden of proof. Indeed, it would impose an impossible burden of proof on the shippers--the requirement that the shippers demonstrate that market dominance existed over ten years ago. It is apparent that it would be most difficult to prove that the carriers had market dominance over water soaked, distressed fishmeal that moved on an emergency basis in 1972.
 
 III. CONCLUSION
 
 26
 Having thoroughly reviewed the legislative history of the 4R Act and the parties' contentions, we must conclude that the 4R Act's market dominance requirement should be applied prospectively only. Retroactive application of the 4R Act would violate the legislative scheme and would result in manifest injustice to the parties. Hence, we set aside the ICC decision and order of December 29, 1982 and remand the matter to the ICC for further administrative proceedings consistent with this decision and the well reasoned decision of the United States District Court dated February 19, 1981. We further direct the ICC on remand to apply the law in effect as of 1974, when the instant administrative proceedings were commenced.
 
 
 27
 REVERSED and REMANDED.
 
 
 
 [1]
 Pub.L. No. 94-210, 90 Stat. 31 (1976), to be incorporated into the U.S.Code as part of the Revised Interstate Commerce Act, 49 U.S.C. Sec. 10101, et seq. The en banc court recently considered the market dominance standard in Western Coal Traffic League v. United States, 719 F.2d 772 (5th Cir.1983) (en banc )
 
 
 [2]
 The District of Columbia Circuit and the First Circuit have held that the 4R Act is to be applied retroactively. See, Potomac Electric Power Co. v. United States, 584 F.2d 1058 (D.C.Cir.1978); and New England Power Co. v. United States, 693 F.2d 239 (1st Cir.1982). The Eighth Circuit has held that the 4R Act's application is prospective only. See, Burlington Northern, Inc. v. United States, 555 F.2d 637 (8th Cir.1977)
 
 
 [3]
 The Justice Department argues in support of the ICC's ruling that the agency was compelled by Bruner v. United States, 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952) to dismiss the case on remand for lack of jurisdiction. However, Bruner is inapposite in the instant case and, therefore, does not control it
 The Supreme Court held in Bruner that "when a law conferring jurisdiction is repealed without reservation as to pending cases, all [pending] cases fall with the law". Id. at 116-17, 72 S.Ct. at 584. However, the Court stated further: "Congress has not altered the nature or validity of petitioner's rights for the government's liability but has simply reduced the number of tribunals authorized to hear and determine such rights and liabilities." Id. Thus, the court found that Congress had merely withdrawn jurisdiction from the district court to adjudicate claims against the federal government and had, in its place, vested exclusive jurisdiction over such actions in the Court of Claims; the statutory change was purely jurisdictional in nature and did not affect the ultimate availability of relief for the claims at issue.
 Even though the 4R Act includes no "reservation as to pending cases," it is clearly distinguishable from the congressional action discussed in Bruner, because it does more than merely shift jurisdiction from one forum for a group of claims. By providing in the 4R Act that it is now unlawful for a railroad to charge an unjust and unreasonable rate only if the railroad has market dominance, Congress has wiped out an entire set of substantive claims which previously could have been brought against railroads without regard to the issue of market dominance. Hence, the instant case raises a different problem from the purely jurisdictional issue addressed in Bruner.
 
 
 [4]
 Indeed, the en banc Court noted in Western Coal:
 The premise of railroad dominance had become outdated.... ' [T]here are few significant commodities which are not practically susceptible to competition by at least two competing modes of surface transportation.'
 Western Coal Traffic League v. United States, 719 F.2d at 775. Moreover, Congress concluded that extensive, industry-wide regulation was no longer justified in light of the significant financial losses being incurred by the railroads. Sen.Rep. No. 499, 94 Cong. 2d Sess. 2-3, reprinted at 1976 U.S.Code Cong. & Ad.News 14, 15-17.